KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

LOUISVILLE BUILDERS SUPPLY
COMPANY, A Corporation,
Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

READY–MIX CONCRETE COMPANY,
Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

R. W. GREENE, Jr., et al., d/b/a
Concrete Supply Company,
Appellees.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

AMERICAN BUILDERS SUPPLY
COMPANY, Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

COLONIAL SUPPLY COMPANY, Inc.,
Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

WORRALL BROTHERS, INC., Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

CONSUMER SUPPLY COMPANY, Inc.,
Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

NUGENT SAND COMPANY, Inc.,
Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

VALLEY CONCRETE COMPANY, Inc.,
Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

OHIO RIVER SAND COMPANY, Appellee.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION OF the COMMON-
WEALTH OF KENTUCKY, Appellant,

v.

E. T. SLIDER COMPANY, Appellee.

Court of Appeals of Kentucky.

Nov. 10, 1961.

158

Paul E. Tierney, Frankfort, Ralph H. Logan, Hardy & Logan, Louisville, for appellant.

W. Scott Miller, Louisville, for American Builders Supply Co.

William F. Trusty, Jr., Louisville, for Nugent Sand Co., Inc. and Consumer Supply Co.

Thomas C. Carroll, Louisville, for Louisville Builders Supply Co. and Worrall Brothers, Inc.

Samuel Wells, Louisville, for Ready-Mix Concrete Co.

Thomas S. Dawson, Louisville, for Concrete Supply Co. and Valley Concrete Co., Inc.

C. H. Block and Samuel Manly, Louisville, for E. T. Slider Co.

Albert Reutlinger, Louisville, for Ohio River Sand Co.

Ernest Woodward, II, Louisville, for Colonial Supply Co.,

CULLEN, Commissioner.

Employes of 11 different builders' supply companies in Louisville applied for unemployment compensation benefits for a five-week period in the summer of 1958 during which they claimed to have been unemployed as a result of a lockout by their employers. Their applications were contested by the employers on the ground that the loss of employment was caused by a strike. The Kentucky Unemployment Insurance Commission found that there had been a lockout and entered orders awarding compensation benefits. On appeals to the Franklin Circuit Court judgments were entered setting aside the orders of the commission on the ground that the cause of the unemployment was a strike. From these judgments (11 in number—one for each em-

ployer) the commission has appealed to this Court. (In seven of the cases there are motions for appeal.)

The governing statute, KRS 341.360, provides in part that no worker may be paid benefits for any week of unemployment with respect to which a "strike or other bona fide labor dispute which caused him to leave or lose his employment is in active progress in the establishment in which he is or was employed," but that "a lockout shall not be deemed to be a strike or a bona fide labor dispute and no worker shall be denied * * benefits by reason of a lock-out."

The particular problem in this case arises out of the fact that the 11 employers (and a twelfth one) were associated together for collective bargaining and contracting purposes. The question is whether the action taken by the employes' union constituted a strike against all of the employers, or whether there was a strike against only one of the employers followed by a lockout by the others.

Nine of the employers here involved, and another one, the R. B. Tyler Company, had for a number of years been associated together in a formal organization known as the Building Material Dealers and Haulers Association. The association had a labor contract with the union. The other two employers here involved were not members of the association but they had become signatory parties to the association's contract, so for the purposes of this case they may be treated the same as if they were members of the association.

The contract expired on June 20, 1958. During a period which began prior to that date and extended into July, negotiations for a new contract were carried on between representatives of the association and representatives of the union. Demands were made by the union for an increase in wages and for other advantages. At first the association insisted that the new contract be on the same terms as the old one, but during the course of the negotiations the association offered an increase in wages less than that demanded by the union. The offer was rejected. The employes continued to work under the terms of the old contract while the negotiations were going on, but by a "strike vote" they authorized their union representatives to call a strike against any or all of the members of the association, as the representatives might deem advisable.

On the morning of July 16 the union called a strike against the R. B. Tyler Company. (The employes of that company have not sought unemployment compensation benefits because admittedly they went out on strike.) That afternoon the secretary-treasurer of the union was quoted in the Louisville Times as saying that the Tyler strike was "the start of an industry-wide strike," and that by the next day six of the major employers would be struck. (That night the secretary-treasurer asked a television station to broadcast an appeal to the workers at all of the plants except that of the Tyler Company to report for work the next morning.)

On the afternoon of July 16 the members of the Association held an emergency meeting, at which they authorized their secretary to send to the union, the next morning, the following telegram:

> "The member firms of the Louisville Building Material Dealers and Haulers Association construe the strike called by your union yesterday against the R. B. Tyler Company to be an action against the bargaining rights of the Association and its members. In order to protect the existence of the bargaining powers and privileges of the Association you and your union members who are employed by Association members are hereby notified that effective 7:01 a. m., July 17, 1958, the local business establishments operated by Association members whose employes are not then on strike will be temporarily closed."

The telegram was sent to the union president at 6:44 a. m. on July 17.

The record indicates that on the morning of July 17 there was confusion on the part

of the employes of the association members (other than Tyler) as to their work status. The employes all appeared at the plant locations, but none of them were put to work. At most of the plants they were told not to work. At others they stayed outside the plant and did not attempt to come in, and the employer made no effort to find out whether they intended to work. It is our opinion that the evidence supports the finding of the Unemployment Insurance Commission that the failure of the employes to go to work on that morning was attributable to action of the employers.

The employes remained out of their employment until August 20, at which time a new contract was executed.

The employers maintain that by reason of the fact that they for years had constituted a collective unit in their bargaining and contracting relationships with the union, the strike against the Tyler Company was in reality a strike against all of the employers, and that they had notified the union in their negotiations that they would consider a strike against one company as a strike against all. It is to be noted, however, that in their telegram to the union they did not say that they construed the strike against the Tyler Company to be a strike against all of them, but rather they said they construed it to be "an action against the bargaining rights of the Association and its members" (which of course it was). Also, the telegram stated that the plants of the Association members "whose employes are not then on strike" would be closed on July 17.

The employers rely upon cases from California and Utah to support the proposition that where for a substantial period of time a union has dealt with an association of employers as a bargaining unit, a strike against one of the members of the association constitutes a strike against all so as to bar the employes from unemployment compensation benefits under a statute denying benefits where the work stoppage is caused by a strike. Particular reliance is placed on McKinley v. California Employment Stabilization Commission, Calif., 34 Cal.2d 239, 209 P.2d 602, and Olof Nelson Construction Company v. Industrial Commission, Utah, 121 Utah 525, 243 P.2d 951.

There are several reasons why the California and Utah cases are not of controlling weight. In the first place, in neither of those states does the unemployment compensation statute provide (as does our Kentucky statute) that an employe shall not be denied benefits in case of a lockout. In the second place, in both of the cases relied upon, where there was a strike against one member of the employers' association and the other members then closed their plants, the court used the term "lockout" to describe the action of the employers who closed their plants. (For example, in the California case, 209 P.2d at page 606, the court said, "here the lockout of the bakers was due to a strike".) In the third place, the courts of both California and Utah applied a "who started it" theory, under which a lockout following a strike is deemed to have been *caused by* the strike so that the resulting unemployment falls within the statutory prohibition against payment of benefits where the cessation of work is caused by a strike. This theory was expressly rejected by our Court in Detroit Harvester Co. v. Kentucky Unemployment Insurance Commission, Ky., 343 S.W.2d 365.

The appellant, Kentucky Unemployment Insurance Commission, refers us to Bucko v. J. F. Quest Foundry Co., 229 Minn. 131, 38 N.W.2d 223, which involved a Minnesota statute authorizing unemployment compensation benefits where the unemployment is caused by a lockout. In that case the union called a strike against three members of a 12-member employers' association, following which the other nine members closed their plants. The court held that the employes of the nine members had been locked out and were entitled to compensation. We concur in the reasoning of the Minnesota court and we reach the conclusion that in the cases before us there was a lockout within the meaning of the statute.

It seems to us that the controlling question under our statute is: What was the *immediate* cause of the cessation of employment? The record here shows that the employes of the 11 firms in question did not in fact go out on strike, but were excluded from working by their employers. It is true that the lockout grew out of the labor dispute, was initiated by the strike against the Tyler Company, and constituted an effort by the employers to invoke a weapon of their own to combat the potential strike weapon of the union. It is also true that a lockout may be a lawful weapon for the employer to use in a labor dispute. But the trouble is that in the unemployment compensation statute the legislature has chosen to limit the strength and effectiveness of the lockout weapon by permitting the locked out employe to receive unemployment benefits.

The appellee employers argue that under the definition set forth in Barnes v. Hall, 285 Ky. 160, 146 S.W.2d 929, 936, a "lockout" is a cessation of the furnishing of work by the employer in order to get "more desirable terms than then existed," and that in the instant cases the employers were not seeking more favorable terms than under the previous, expired contract, but in fact were willing to grant some increase in wages. In Detroit Harvester Co. v. Kentucky Unemployment Insurance Commission, Ky., 343 S.W.2d 365, 367, a lockout is somewhat similarly defined as a refusal to furnish work "for the purpose of gaining * * * more favorable terms or concessions."

The argument overlooks the fact that at the time of the cessation of work in the instant cases the previous contract had expired and there was no contract in existence. So the terms that "then existed" were no terms at all. We think that in such a situation an employer who uses the refusal of work as a bargaining weapon against the demands of the union as to the terms of a new contract may be considered to be seeking more desirable or more favorable terms. The situation in Ward v.

Barnes, Ky., 266 S.W.2d 338, is not comparable because there the employer simply laid off some workers because his compliance with the union demands as to work shifts had resulted in a decrease in the amount of work available. And in Barnes v. Hall, 285 Ky. 160, 146 S.W.2d 929, there was no refusal of work by the employers.

Actually, it is questionable whether the definitions of "lockout" set forth in the Barnes v. Hall and in the Detroit Harvester case are entirely adequate, because it would seem that if an employer ceases to furnish work for the purpose only of stopping his employes from asking for terms more favorable to them than those under an existing contract, the same policy of labor relations law is involved as where the purpose of the employer is to obtain terms more favorable to him. It may be that the test should be, as suggested by some of the language in the Detroit Harvester case, whether the purpose of the employer is to compel the employe "to accept terms or make concessions favorable to the employer," regardless of whether the terms or concessions are to be considered "more" favorable than presently existing terms.

Some of the appellee employers maintain that their actual purpose in closing their plants was to guard against sabotage by strikers and to protect their equipment from damage that might occur if their employes should go on strike during the course of working hours and abandon the equipment (particularly ready-mix concrete trucks). However, the record does not show that there was any substantial basis for a fear of damage from such sources. Furthermore, in the telegram sent to the union the only stated purpose of the closing of the plants was "to protect the existence of the bargaining powers and privileges of the Association."

The contention is made that a number of the employes who received "strike benefits" from the union in the amount of $15 per week, during the period the plants were closed, were in effect employed by the

union for picketing purposes (the picketing protested the claimed lockout) and therefore they were not "unemployed" within the meaning of the statute. Reference is made to various rulings to the effect that strike benefits may constitute "income" for income tax purposes. It seems clear to us, however, that the fact that strike benefits may constitute "income" does not mean that they constitute wages for employment. The evidence here does not establish that the strike benefits were conditioned upon doing work on the picket lines.

The appellees attempt to draw an analogy to cases involving vacation pay, but we find no analogy. An employe who receives vacation pay is still in employment and the pay is by reason of the employment, but an employe receiving strike benefits from his union is not in employment and the benefits are not wages for employment.

A final contention of the appellees is that the employes who walked the picket lines were not "available for work" within the requirements of the unemployment compensation law. In support of the contention the appellees cite Tucker v. American Smelting & Refining Co., 189 Md. 250, 55 A.2d 692. It is true that in the Maryland case the court did use some language to the effect that the employes on the picket lines were not available for work, but the actual basis given for denying compensation benefits was that the employes were actively participating in a labor dispute, which constituted a bar to benefits under the statute.

There is nothing in the record in the instant cases to show that the employes on the picket lines had not registered for work and were not making reasonable efforts to obtain suitable work, in accordance with KRS 341.350. In this respect it is significant that KRS 341.100(2) (d) states that work shall not be deemed "suitable" if the acceptance of such work would be prejudicial to the continuance of an established employer-employe relationship to which the worker is a party. The statutes clearly do not contemplate that a worker who is tem-

porarily out of employment by reason of a labor dispute must seek some other permanent employment.

In the cases where there are motions for appeal the motions are sustained, and in all of the cases the judgments are reversed with directions to enter judgments affirming the orders of the Unemployment Insurance Commission.