MEMCO ET AL. *v.* MARYLAND EMPLOYMENT
SECURITY ADMINISTRATION ET AL.

[No. 17, September Term, 1977.]

*Decided July 1, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Kenneth F. Hickey*, with whom were *Richard C. Hotvedt*, *Robert A. Dufek* and *Morgan, Lewis & Bockius* and *John A. Buchanan* and *Sasscer, Clagett, Channing & Bucher* on the brief, for appellants.

*Joel J. Rabin, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Lois F. Lapidus, Assistant Attorney General*, on the brief, for Employment Security Administration, part of appellees. *Robert E. Paul*, with whom were *Spelman, Eisenberg, Paul & Wagner* and *Browne L. Kooken* and *Dukes & Troese* on the brief, for Amalgamated Meat Cutters Local 593, other appellees.

DIGGES, J., delivered the opinion of the Court.

Subsection 6 (e) of the Maryland Unemployment Insurance Law provides in general that an individual shall be disqualified from receiving benefits if his unemployment is the result of a work stoppage caused by a labor dispute other than a lockout. Md. Code (1957, 1969 Repl. Vol.), Art. 95A. In the present action we are asked to determine whether certain union employees should have been denied unemployment benefits based on the labor dispute disqualification, and, secondarily, whether the subsection's exception for locked out employees is preempted by federal labor law. We conclude that, under the circumstances of this case, the claimants are not disqualified from receiving compensation inasmuch as the cause of the work stoppage was a lockout and not some other type of labor dispute. Moreover, because the operation of subsection 6 (e) only remotely affects the balance between management and labor in collective bargaining, if it impacts upon that equilibrium at all, there is no impermissible conflict with federal policy.

The present case arose following a stoppage of work in connection with a collective bargaining contract dispute between members of appellee Amalgamated Meat Cutters and Allied Workers of North America, Local 593, AFL-CIO, and the District of Columbia Food Employers Labor

Relations Association (FELRA).[1] The facts, submitted to the Board of Appeals of the Maryland Employment Security Administration (also an appellee) by joint stipulation of appellant MEMCO [2] and appellee Local 593, are relatively uncomplicated. FELRA member companies and Local 593 have, over the past several years, negotiated a number of collective bargaining agreements covering meat department employees, including an agreement entered into in 1972 which was effective from September 17 of that year to September 15, 1973. Approximately three months prior to the expiration of this contract, the union notified FELRA that it wished to reopen the 1972-73 agreement and negotiate a new one. Thereafter, negotiations commenced and continued through the middle of October, during which time representatives of Local 593 stated that if FELRA did not agree to its demands, the union had selected Giant Food, Inc., for strike action. In reply, FELRA informed Local 593 that a strike against any one of FELRA's members would be treated as a strike against the entire association.

As the reader of this opinion might have anticipated, FELRA did not accede to the union's demands, and the union rejected FELRA's contract offer. On October 21, Local 593 held two general meetings at which the entire local membership voted to strike all area Giant stores; however, the meat department employees of the other six FELRA member companies were specifically instructed by the union to report to work as scheduled. At 6:15 a.m. on October 22, Local 593 went on strike at Giant's stores in the Washington, D.C., metropolitan area, but some, if not all, employees of the other FELRA stores reported to their jobs as usual. That afternoon, store managers of the six FELRA members which were not struck told their meat department

1. FELRA, an unincorporated association formed by Washington area food retailers for the purpose of engaging in collective bargaining on behalf of its member companies, is composed of Giant Food, Inc., Safeway Stores, Inc., The Great A & P Tea Company, MEMCO Foods, Food Fair Stores, Inc., Acme Markets, and the Grand Union Company.

2. Although for convenience we shall refer to the appellants in the singular or specifically as MEMCO, all members of FELRA except Giant Food, Inc., are appellants in the action before us. See note 1 supra.

employees to leave work and not to report until further notice; moreover, some Local 593 employees who reported during the afternoon were not permitted to work.[3] The strike and shutdown continued through October 28, 1973, at which time the general membership of Local 593 ratified an agreement which had been reached between the representatives of FELRA and the union.

Claiming to be entitled to compensation for the week they were without work, numerous employees of FELRA members applied to the Department of Employment and Social Services for unemployment compensation, but were denied benefits on the ground that their unemployment was "due to a stoppage of work" existing because of a "labor dispute ... under Section 6 (e) of the Maryland Unemployment Insurance Law." Eighteen of these claimants, none of whom are Giant employees, appealed that administrative determination to the Board of Appeals. The board reversed the initial denial, stating that the shutdown engaged in by FELRA members constituted a "lockout" within the meaning of the pertinent exception to the labor dispute disqualification provision of the unemployment insurance statute. FELRA members appealed that adverse decision to the Circuit Court for Prince George's County. There, Judge James F. Couch, Jr., concluded "that the use of the phrase 'other than a lockout' in the statute, without any qualifications, means exactly what it says, that if there is a lockout then the employee . . . is entitled to his unemployment compensation." MEMCO subsequently filed an appeal to the Court of Special Appeals, but we granted certiorari before that court considered the case. Since we agree with the conclusion of

---

3. Additionally, the union contends that an undetermined number of store managers also told the employees they were "locked out," but FELRA maintains that the managers read a uniform statement which did not use the term "lockout" in any manner. Although the parties before the Board of Appeals requested that body to make a finding as to whether the actual use of the disputed term was relevant, the board failed to do so. However, in light of its determination that each store's action "amounted to a lockout," we think the board necessarily concluded that the events demonstrated the existence of a lockout regardless of whether any store manager specifically used that term.

Judge Couch and reject the appellant's contention with respect to federal preemption, we shall affirm the judgment of the Circuit Court for Prince George's County.

Before commencing our discourse on subsection 6 (e), we pause momentarily to mention that pursuant to subsection 7 (h) the findings of fact of the Board of Appeals, in the absence of fraud, are conclusive so long as they are supported by evidence, and judicial review is confined solely to questions of law. Code (1957, 1969 Repl. Vol., 1976 Cum. Supp.), Art. 95A, § 7 (h); *see, e.g., Allen v. CORE Target City Y. Prog.*, 275 Md. 69, 74, 338 A. 2d 237, 241 (1975) (citing cases). In the present case, the Board of Appeals made five "findings of fact":

A. That the collective bargaining agreement between the Employer and the Union expired on September 15, 1973.

B. It further finds that the Employers were members of an association known as FELRA (Food Employers Labor Relations Association), and who were negotiating with the Claimants' bargaining unit to establish a new agreement.

C. It further finds that on October 22, 1973, the Union membership established a picket line at, and thereafter, struck the stores of one of the members of the association.

D. It further finds that subsequent to that action, that members of this Union who were employed at stores not struck were informed by store management that there would be no further work for them, and that this action by the Employers amounted to a lockout.

E. It further finds that there was not any labor dispute between the Employers and the Claimants herein involved.

Findings A, B, and C, as well as all but the last clause of D, are in accord with the facts as stipulated by the parties; however, MEMCO asserts, and we agree, that the last clause

of D and all of finding E are legal conclusions. *See Philco Corp. v. Unemployment Comp. Bd. of Review*, 430 Pa. 101, 242 A. 2d 454, 456 n. 2 (1968). Consequently, we are not bound under subsection 7 (h) by the board's conclusions in D and E merely because they are labeled "findings of fact." Rather, our jurisdiction extends to a plenary consideration of whether the Board of Appeals erred, as a matter of law, when it found that the claimants were not disqualified from receiving benefits under the labor dispute disqualification provision.

### I. Statutory Construction

With that standard of review in mind, we turn to the statutory language in controversy. Pursuant to subsection 6 (e) as amended by Chapter 153 of the Laws of 1966, an individual is disqualified for benefits:

> For any week with respect to which the Executive Director finds that his *unemployment is due to a stoppage of work, other than a lockout, which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed,* provided that this subsection shall not apply if it is shown to the satisfaction of the Executive Director that —
>
> (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
>
> (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this

> subsection, be deemed to be a separate factory, establishment, or other premises. [(Emphasis added.)]

Notwithstanding the apparent clarity of the language italicized above, the appellant nevertheless argues that in the present action, the claimants should be disqualified from receiving benefits. MEMCO contends, as we understand it, that the labor dispute disqualification must be interpreted in light of "the mechanics of multi-employer collective bargaining," and in the context of "the overall objective of the unemployment compensation statute." In essence, MEMCO proceeds on the premise that the claimants' unemployment was *voluntarily* caused inasmuch as the employees' strike, constituting a labor dispute at every FELRA place of employment, "preexisted and ultimately encompassed the subsequent defensive shutdown."

To understand fully the thrust of MEMCO's rationale, we must momentarily digress to explain certain aspects of collective bargaining in the context of federal labor law. For a variety of reasons, it has become common in this country for employers to form groups known as multi-employer associations or multi-employer bargaining units. As expressed by one commentator, 1 J. Jenkins, *Labor Law* § 3.16 (1968):

> The desire to have uniform wage rates throughout a particular industry, the relative lack of economic strength of a comparatively small employer when confronted with giant unions, the necessity for expert advice in a tricky and complicated field, and the economic survival advantage in presenting a common front to union demands, joined with a host of other factors, have all contributed to this development.

Two well settled rules apply to multi-employer bargaining situations. In the first place, each "employer is bound to contracts negotiated by an association by virtue of its membership and its authorization to the association to

negotiate the contracts." *Paul v. Lindgren,* 375 F. Supp. 843, 850 (N.D. Ill. 1974); *see NLRB v. Strong,* 393 U. S. 357, 359, 89 S. Ct. 541, 21 L.Ed.2d 546 (1969). And although under federal law an employer may, upon adequate written notice, unilaterally withdraw from such a unit prior to the commencement of negotiations, once negotiations have begun, withdrawal can be effectuated only on the basis of mutual consent of the employer and the union or in the event of unusual circumstances. *Retail Associates, Inc.,* 120 N.L.R.B. 388, 395 (1958); *see, e.g., NLRB v. Beck Engraving Co.,* 522 F. 2d 475, 481 (3d Cir. 1975); *NLRB v. Central Plumbing Co.,* 492 F. 2d 1252, 1255 (6th Cir. 1974); *Lowe v. O'Conner,* 163 Mont. 100, 515 P. 2d 677, 678 (1973).

Considering these principles, we now focus once again on the relationship between Local 593, the union representing all meatcutter employees working for FELRA members, and FELRA, the association representing seven individual retail food employers in the Washington, D.C., area. After negotiations for a new contract commenced in the summer of 1973, it is clear that all seven of the retailers were bound to accept the agreement as negotiated by FELRA. Viewing the facts in this context, we agree with MEMCO that the selective or "whipsaw" strike against Giant was a technique of exerting economic pressure against all members of FELRA. *See NLRB v. Truck Drivers Local 449,* 353 U. S. 87, 90 n. 7, 77 S. Ct. 643, 1 L.Ed.2d 676 (1957). We also agree that the subsequent shutdown by other members of the association was a purely defensive measure to preserve the integrity of the multi-employer bargaining unit. Nonetheless, we are unable to concur in the appellant's ultimate contention—that the claimants here, employees of the stores which defensively shut down following the strike at Giant, are disqualified by virtue of subsection 6 (e) from receiving unemployment benefits. We now consider, and reject, what we discern to be MEMCO's four arguments urged in support of its contention.

MEMCO initially submits that due to the characteristics underlying the multi-employer collective bargaining

situation, FELRA should be treated as the single employer of the claimants. Essentially, the appellant's assertion is that when part (Giant) of the employer (FELRA) was struck following a vote of all members of the union, a situation was created which is indistinguishable from that of a partial strike by a small segment of a class of employees. While it is true in other circumstances that claimants of the same "grade or class of workers" may be disqualified under subsection 6 (e) (2), regardless of whether they participate in a labor dispute, *see Bethlehem Steel Co. v. Board,* 219 Md. 146, 154, 148 A. 2d 403, 407-08 (1959), it does not follow that FELRA is the employer of the claimants here for purposes of subsection 6 (e). In fact, the plain language of the statute belies any such interpretation. A claimant is disqualified only if a labor dispute exists "at the factory, establishment, or other premises at which he is or was last employed . . . ." Clearly, under this wording, the individual place .of employment, not a multi-employer association, is the relevant entity for purposes of determining whether a labor dispute is the cause of a particular employee's unemployment.

With respect to its second argument, MEMCO apparently is asking us to construe the term "lockout" as used in subsection 6 (e) so as not to encompass the actions taken by it in response to the selective strike against Giant. We are convinced, however, that the claimants' unemployment was caused by a lockout at the place of their employment. The parties stipulated that only Giant stores were struck, and the record is clear that it was the managers who told the workers at the other FELRA stores to "leave work and not . . . report until further notice." Since, under these circumstances, the claimants' employers were directly responsible for the work stoppage at FELRA member stores other than Giant in that they refused to maintain the status quo in spite of the workers' willingness to continue working under preexisting terms, it is plain that a "lockout" and not a "strike" existed at each claimant's last place of

employment.[4] *See Philco Corp. v. Unemployment Comp. Bd. of Review*, 430 Pa. 101, 242 A. 2d 454, 455 (1968). Moreover, utilizing the widely accepted definition of the term "lockout" — an employer's withholding of work from his employees to gain a concession from them — an identical conclusion is reached. *See, e.g., Bankston Creek Collieries v. Gordon*, 399 Ill. 291, 77 N.E.2d 670, 674 (1948); *Gorecki v. State*, 115 N. H. 120, 335 A. 2d 647, 649 (1975); *Marathon Electric Mfg. Corp. v. Industrial Comm.*, 269 Wis. 394, 69 N.W.2d 573, 580 (1955); Restatement of Torts § 787, Comment a (1939); Annot., 62 A.L.R.3d 437, 448-52 (1975). Furthermore, while we agree with MEMCO that it engaged merely in a defensive lockout, we are not at liberty to construe the unqualified wording of the statute as encompassing only offensive lockouts. If the General Assembly had wished to distinguish between the two types of lockouts, it obviously would have expressed that intention by utilizing more explicit language, as has at least one other state's legislature. *See* Colo. Rev. Stat. § 8-73-109 (1973 & 1976 Cum. Supp.); *cf.* Miss. Code Ann. § 71-5-513A (5) (a) (1972) (restricted lockout exception to labor dispute disqualification provision). *See also Kania v. Shaffer*, 31 Colo. App. 438, 506 P. 2d 384 (1972).

The appellant's third contention is that, even if there were a lockout, the claimants are nevertheless ineligible for unemployment benefits because their voting for the strike at Giant was tantamount to a voluntary cessation of work at their respective places of employment. For this proposition, MEMCO relies on the California "volitional test." *See McKinley v. California Employment Stabilization Com'n*, 34 Cal. 2d 239, 209 P. 2d 602, 605-06 (1949); *Bodinson Mfg. Co. v. California E. Commission*, 17 Cal. 2d 321, 109 P. 2d 935, 940

---

4. We point out that it is inconsequential that a "labor dispute" existed at the claimants' places of employment at least from the time Local 593 employees went on strike at Giant. *See* Md. Code (1957, 1964 Repl. Vol.), Art. 100, § 74 (c), *quoted in* Typographical Union v. Hearst, 246 Md. 308, 319, 228 A. 2d 410, 415-16 (1967). We say this because regardless of the existence of a labor dispute, the direct or proximate cause of the stoppage of work was a lockout. *See* Tucker v. American S. & Ref. Co., 189 Md. 250, 257-59, 55 A. 2d 692, 695-96 (1947); *cf.* Saunders v. Unemp. Comp. Board, 188 Md. 677, 690-92, 53 A. 2d 579, 585-86 (1947).

(1941). *See also Teamsters, Chauffeurs & Helpers, Local Unions v. Board of Review,* 10 Utah 2d 63, 348 P. 2d 558 (1960); *Olof Nelson Const. Co. v. Industrial Commission,* 121 Utah 525, 243 P. 2d 951 (1952). Under this approach, workers who become unemployed due to an offensive lockout by their employer are eligible to recover benefits whereas workers who are locked out following a whipsaw strike against a multi-employer bargaining unit may be determined to be "voluntarily" unemployed and thereby be ineligible to recover benefits. This rule arose in the context of an unemployment compensation law having no lockout exception to its labor dispute disqualification clause, and apparently was the California Supreme Court's attempt to effectuate what it perceived to be a legislative intent only to render ineligible those workers who "voluntarily" ceased working. However, in adopting this view, it appears to us that the court did nothing less than usurp the legislature's function. The overwhelming number of states having statutes similar to California's apparently agree with our analysis, as they disqualify from benefits workers who strike or are locked out, regardless of their intent. *See, e.g., Buchholz v. Cummins,* 6 Ill. 2d 382, 128 N.E.2d 900, 902-03 (1955); *Adams v. Industrial Commission,* 490 S.W.2d 77, 79-80 (Mo. 1973); *Henzel v. Cameron,* 228 Or. 452, 365 P. 2d 498, 502 (1961); *In re North River Logging Co.,* 15 Wash. 2d 204, 130 P. 2d 64, 65 (1942). Moreover, the Maryland legislature, by choosing to exempt the lockout situation from labor disputes disqualifying claimants from benefits, has in essence determined what is a voluntary and what is an involuntary cause of unemployment. Therefore, particularly in light of the exception, we are not at liberty to delve into the subjective intent of workers involved in labor disputes. We note that this view is in accord with those courts interpreting statutes similar to this State's. *See, e.g., Kentucky Unemp. Ins. Com'n v. Louisville Bldrs. Sup. Co.,* 351 S.W.2d 157, 160-61 (Ky. 1961); *Bucko v. J. F. Quest Foundry Co.,* 229 Minn. 131, 38 N.W.2d 223, 230 (1949). *See generally* Lewis, *The Lockout Exception: A Study in Unemployment Insurance Law and Administrative*

*Neutrality*, 6 Cal.-W.L.Rev. 89, 104-09 (1969). Additionally, we mention that in the present case, we would be hard pressed to conclude that the claimants voluntarily became unemployed even if we were to adopt the California rule. We say this because clearly the selective strike at Giant did not inevitably lead to the defensive lockout of employees of the remaining FELRA member companies. Indeed, the record discloses that the 1973 shutdown was the first such action in FELRA's bargaining history with Local 593, and was contrary to what occurred in 1970. In that year, the union struck Grand Union for five days but the other FELRA members did not shut down.

Finally, we reject the appellant's remaining contention, that allowing the claimants to recover benefits would contravene the policy of the unemployment compensation statute. Although the declaration of policy enunciated in section 2 of Article 95A speaks in terms of aiding "persons unemployed through no fault of their own," these words do not themselves establish a disqualification based on unemployment resulting from the "fault" of the claimant. Rather, the specific provisions set out in section 6 enumerate those grounds the legislature has determined disqualify claimants from receiving benefits. *See Allen v. CORE Target Y. Prog.*, *supra*, 275 Md. at 76, 338 A. 2d at 241-42. Consequently, since the legislature has chosen to exclude locked out employees from the labor dispute disqualification, it has concluded that such workers are unemployed "through no fault of their own." The General Assembly has chosen not to distinguish between offensive and defensive lockouts, and, similarly, not to differentiate the single employer bargaining situation from one involving multi-employer bargaining. Under these circumstances, this Court cannot undercut the legislature's directive by making an independent determination of "fault" with respect to an employee's unemployment.

In sum, we conclude that the clear language of subsection 6 (e) requires us to hold that the claimants are not disqualified from receiving unemployment benefits. In our

view, a labor dispute existed at the claimants' places of employment, but the stoppages of work were directly caused by the employers' lockouts. *See Typographical Union v. Hearst,* 246 Md. 308, 323, 228 A. 2d 410, 418 (1967). While many of the appellant's claims raise legitimate questions of policy, they must be addressed to the legislature since an unambiguous statute permits the Court no room to deviate from its mandate. *See, e.g., Allen v. CORE Target City Y. Prog., supra,* 275 Md. at 77, 338 A. 2d at 242; *Tucker v. American S. & Ref. Co.,* 189 Md. 250, 258, 55 A. 2d 692, 695 (1947).

## II. Federal Preemption

Having determined that the claimants here are not disqualified from receiving benefits by the terms of subsection 6 (e), we now consider the appellant's second major assertion — that any award of unemployment compensation to the appellees would seriously impair the balance of power fashioned by Congress between employer and union in collective bargaining. Concluding that the payment of unemployment compensation to workers who are locked out by their employers is not preempted by federal labor law, we must reject MEMCO's contention to the contrary.[5]

In the past several years, there has been a plethora of judicial decisions addressing the issue whether national labor policy preempts state public payments to employees who are out of work as the result of labor disputes. The two federal appellate courts which have ruled on this question in the context of state welfare benefits to strikers have concluded that such payments are not prohibited. *See Super Tire Engineering Co. v. McCorkle,* 550 F. 2d 903, 908 (3d Cir. 1977); *ITT Lamp Division of Int. Telephone & T. Corp. v.*

---

5. We note that while MEMCO challenges the statute on no other federal ground, the United States Supreme Court recently held that an Ohio statutory provision similar to Maryland's labor dispute disqualification did not conflict with the Social Security Act, and did not violate federally guaranteed due process or equal protection rights of the claimants. *See* Ohio Bureau of Employment Services v. Hodory, 431 U. S. 471, 97 S. Ct. 1898, 52 L.Ed.2d 513 (1977).

*Minter,* 435 F. 2d 989, 994 (1st Cir. 1970), *cert. denied,* 402 U. S. 933 (1971). *See also Super Tire Engineering Co. v. McCorkle,* 416 U. S. 115, 94 S. Ct. 1694, 40 L.Ed.2d 1 (1974). And, with respect to the payment of unemployment compensation under a statutory lockout exception, a Pennsylvania court which considered the issue determined that such awards are not preempted. *See Unemployment Comp. Bd. of Rev. v. Sun Oil Co. of Pa.,* 19 Pa.Commw.Ct. 447, 338 A. 2d 710, 714-17 (1975); *cf. Holland Motor Exp., Inc. v. Michigan Emp. Sec. Com'n,* 42 Mich. App. 19, 201 N.W.2d 308, 312-14 (1972). *See generally* Comment, *Pennsylvania's Lockout Exception to the Labor Dispute Disqualification from Unemployment Compensation Benefits: Federal Challenges and Issues,* 80 Dick.L.Rev. 70 (1975). However, in the area of awards of unemployment benefits to strikers, courts are divided on the question whether such payments impermissibly conflict with federal labor policy. *Compare New York Telephone Co. v. New York State Department of Labor,* 434 F. Supp. 810, 820 (S.D. N.Y. 1977) [BNA Daily Labor Report No. 103, at D-6, decided May 23, 1977] (payment of unemployment benefits to strikers preempted), *and Hawaiian Tel. Co. v. State of Hawaii Dept. of L. & I. Rel.,* 405 F. Supp. 275, 290 (D. Hawaii 1975) (same), *with Almacs, Inc. v. Hackett,* 312 F. Supp. 964, 968 (D.R.I. 1970) (payment of unemployment benefits to strikers not preempted), *and Sadallah v. KLM Royal Dutch Airlines,* 53 App.Div.2d 485, 386 N.Y.S.2d 228, 229-30 (1976) (same); *cf. Grinnell Corp. v. Hackett,* 475 F. 2d 449, 453 (1st Cir.), *cert. denied,* 414 U. S. 858, 879 (1973) (reversal of dismissal of complaint alleging preemption of Rhode Island's statute); *Dow Chemical Co. v. Taylor,* 428 F. Supp. 86, 91 (E.D. Mich. 1977) (denial of summary judgment because of factual issue as to whether operation of state law contravened federal labor policy); *Albuquerque-Phoenix Exp., Inc. v. Employment S. C.,* 88 N. M. 596, 544 P. 2d 1161, 1165 n. 1 (1975) (court unpersuaded by rationale of *Hawaiian Tel. Co.* decision). *See generally* Comment, *Federal Preemption of State Payments of Unemployment Compensation to Strikers,* 64 Geo.L.J. 1343 (1976); 10 Suffolk U.L.Rev. 1194 (1976); 20 Wayne L. Rev.

1191 (1974). In accord with the majority of these cases, we conclude that federal law does not prevent Maryland from awarding unemployment compensation to workers who are locked out following their union's selective strike of one member of a multi-employer bargaining unit.

As this Court has stated: "It seems, in the final analysis, that a federal statute preempts a state statute when such was the Congressional intent." *Ward v. State*, 280 Md. 485, 492, 374 A. 2d 1118, 1121 (1977). Particularly with respect to labor policy, it is not always an easy proposition to determine the scope of congressional intent. *See generally* Cox, *Labor Law Preemption Revisited*, 85 Harv.L.Rev. 1337 (1972); Note, *The Preemption Doctrine; Shifting Perspectives on Federalism and the Burger Court*, 75 Colum.L.Rev. 623, 634-36 (1975). This is so because the doctrine of preemption in this area has been shaped by two competing interests: On the one hand, the broad powers conferred on the National Labor Relations Board to enforce the complex Labor Management Relations Act necessarily imply that conflicting rules of law must not be permitted to operate; on the other hand, because Congress has refrained from specifying the scope of preempted state regulation, the Supreme Court has refused to render nugatory all local regulations that in any way touch interrelationships between employers and employees. *See Farmer v. United Brotherhood of Carpenters Local 25*, 430 U. S. 290, 295-96, 97 S. Ct. 1056, 1061, 51 L.Ed.2d 338 (1977). Decisions holding state authority to be preempted by federal labor law tend to fall into one of two categories: (1) those decisions, based predominantly on the primary jurisdiction of the NLRB, reflecting the concern that the state forum might enjoin conduct which the federal forum would find legal, and (2) those decisions, based on federal protection of the conduct in question, reflecting the concern that state law would restrict the exercise of rights guaranteed by the federal labor acts. *See Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 138, 96 S. Ct. 2548, 2552, 49 L.Ed.2d 396 (1976).

Cases falling within the perimeter of the first branch are controlled generally by the rule set forth in *San Diego*

*Building Trades Council v. Garmon,* 359 U. S. 236, 244, 79 S. Ct. 773, 3 L.Ed.2d 775 (1959):

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.

However, the Supreme Court also recognized in *Garmon* that a state-regulated activity was not preempted when it "was a merely peripheral concern of the Labor Management Relations Act . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the Supreme Court] could not infer that Congress had deprived the States of the power to act." *Id.* at 243-44. In *Farmer v. United Brotherhood of Carpenters Local 25, supra,* the Supreme Court recently indicated that its responsibility in such cases could only be carried out by a balanced inquiry into "the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." 430 U. S. at 297, 97 S. Ct. at 1062.[6] Specifically, the Court appeared to utilize a three-pronged test to determine whether the state regulation is preempted. First, it addressed the question whether the underlying conduct was protected by Section 7 of the National Labor Relations Act or proscribed by Section 8. Second, it determined whether there was present a substantial state interest in regulating

---

6. The Supreme Court also decided to review during its next term yet another case which apparently involves this branch of preemption. *See* Sears, Roebuck & Co. v. San Diego Cty., Etc., 17 Cal. 3d 893, 553 P. 2d 603, 132 Cal. Rptr. 443 (1976), *cert. granted,* 430 U.S. 905, 97 S. Ct. 1172 (1977) (No. 76-750).

the conduct. And, finally, the Court ascertained how great the potential was for interference with the federal scheme. *Id.* at 301-06, 97 S. Ct. at 1064-66.

The second branch of the preemption tree focuses upon the inquiry whether Congress meant to leave an employer or union activity unregulated so as solely "to be controlled by the free play of economic forces." *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n, supra,* 427 U. S. at 140, 96 S. Ct. at 2553. Under this approach, even though a particular activity might not fall within the protection afforded by Section 7 of the Federal Act, it still may be that Congress intended it to be a permissible self-help economic weapon "unrestricted by any governmental power to regulate." *NLRB v. Insurance Agents,* 361 U. S. 477, 488, 80 S. Ct. 419, 4 L.Ed.2d 454 (1960). In *Insurance Agents,* for example, it was held that the use of peaceful, economically harassing activities by employees was "part and parcel of the process of collective bargaining," *id.* at 495, and was protected from NLRB interference. Similarly, in *Garner v. Teamsters Local 776,* 346 U. S. 485, 499-500, 74 S. Ct. 161, 98 L. Ed. 228 (1953), the Supreme Court held that state power to restrict peaceful recognitional picketing was preempted since that area of labor combat was designed to be free of state impingement. The *Garner* and *Insurance Agents* analysis came to fruition in *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U. S. 252, 84 S. Ct. 1253, 12 L.Ed.2d 280 (1964). There, the Supreme Court determined that the application of state law to award damages for peaceful union secondary picketing was preempted. *Id.* at 260. The Court reasoned, *id.* at 259-60:

> This weapon of self-help, permitted by federal law, formed an integral part of the petitioner's effort to achieve its bargaining goals during negotiations with the respondent. Allowing its use is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community. If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon

but did not proscribe when it enacted § 303, the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. [(Footnote and citation omitted.)]

Finally, in *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n, supra,* the Supreme Court, after reviewing the *Insurance Agents, Garner* and *Morton* decisions, 427 U. S. at 142-47, 96 S. Ct. at 2554-56, distilled its approach with respect to the second preemption branch in this manner (*id.* at 147-48, 96 S. Ct. at 2556-57):

Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether "the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes."

In *Lodge 76,* the Supreme Court, concluding that the union's concerted refusal to work overtime was the type of self-help activity which must be left free of regulation, held that a state court's enjoining of it was prohibited because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 427 U. S. at 151, 96 S. Ct. at 2558.

Although these two branches "are often not easily separable," *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U. S. 369, 383 n. 19, 89 S. Ct. 1109, 22 L.Ed.2d 344 (1969), it is clear to us that the instant case poses a preemption question of the second variety. MEMCO's contention essentially is that the payment of benefits to the claimants deprives the employer of his self-help weapon, the defensive lockout, and as such, undermines labor-management stability. There is no suggestion that a matter arguably within the primary

jurisdiction of the NLRB is involved, and we likewise perceive none. Therefore, we must analyze the issue presented in two steps: Is there involved here a self-help activity which Congress intended to leave unregulated except by the free play of economic forces, and if so, does the payment of unemployment benefits to the appellee claimants so curtail or prohibit the protected conduct as to frustrate federal labor policy?

Undoubtedly, members of a multi-employer bargaining unit are permitted by federal law to defensively lock out union employees in response to a whipsaw strike. That issue was definitively settled by the so-called *Buffalo Linen* case, *NLRB v. Truck Drivers Local 449*, 353 U. S. 87, 97, 77 S. Ct. 643, 1 L.Ed.2d 676 (1957), wherein the Supreme Court concluded that a temporary lockout to preserve the integrity of the unit was lawful. *See American Ship Building Co. v. NLRB*, 380 U. S. 300, 317-18, 85 S. Ct. 955, 13 L.Ed.2d 855 (1965); *NLRB v. Brown*, 380 U. S. 278, 283-84, 85 S. Ct. 980, 13 L.Ed.2d 839 (1965). *See also NLRB v. Great Falls Employers' Council, Inc.*, 277 F. 2d 772 (9th Cir. 1960) (not an unfair labor practice to recall locked out employees each week and permit them to work only for such time as to disqualify them from state unemployment compensation). Although we agree with MEMCO that its defensive lockout was legitimate self-help conduct, we do not think the award of unemployment compensation to employees who were prevented from working renders nugatory that economic weapon of the employer or otherwise impermissibly impacts on federal labor policy. While it may be true that the availability in Maryland of unemployment benefits to locked out workers "is a factor lurking in the background of every incipient labor contract," we cannot conclude that Congress has "ruled out such assistance." *Super Tire Engineering Co. v. McCorkle*, 416 U. S. 115, 124, 94 S. Ct. 1694, 40 L.Ed.2d 1 (1974). The effect, if there is any at all, on the balance of power in labor-management relations would have to be solely with respect to the impact on the defensive lockout weapon, and it appears to us that this impact is negligible. Maryland has not attempted to outlaw multi-employer

bargaining associations or in any way prohibit their use of the lockout technique. Rather the State has merely applied a "neutral" law which is "not directed toward altering the bargaining positions of employers or unions but which may have an incidental effect on relative bargaining strength." *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n, supra,* 427 U. S. at 156, 96 S. Ct. at 2560 (Powell, J., joined by Burger, C. J., concurring). Since, in the final analysis, we discern no clear congressional intent to prohibit state regulation of this kind, we think it would be erroneous, in the absence of more definitive evidence, to conclude that the Maryland statute impermissibly impinges upon federal labor policy.

Finally, we note that this issue may have been determined by the United States Supreme Court in *Kimbell, Inc. v. Employment Security Commission of New Mexico,* 429 U. S. 804, 97 S. Ct. 36, 50 L.Ed.2d 64 (1976), where the Court dismissed for want of a substantial federal question an appeal from the Supreme Court of New Mexico involving a challenge on preemption grounds to that state's unemployment insurance law providing benefits to strikers. While undoubtedly that dismissal was a determination on the merits, *see Hicks v. Miranda,* 422 U. S. 332, 344, 95 S. Ct. 2281, 45 L.Ed.2d 233 (1975), the federal courts have drawn conflicting conclusions as to its precedential reach. On the one hand, two federal district courts have reasoned that although the Supreme Court has ruled on the New Mexico statute, this action alone does not mean that other state unemployment compensation laws do not contravene federal labor policy. *See New York Telephone Co. v. New York State Department of Labor,* 434 F. Supp. 810, 820 (S.D.N.Y. 1977) [BNA Daily Labor Report No. 103, at D-7, decided May 23, 1977]; *Dow Chemical Co. v. Taylor,* 428 F. Supp. 86, 90 (E.D. Mich. 1977). On the other hand, the United States Court of Appeals for the Third Circuit has concluded that by the *Kimbell* decision the Supreme Court rejected the contention that national labor policy precludes compensation to strikers. *Super Tire Engineering Co. v. McCorkle,* 550 F. 2d 903, 908 (3d Cir. 1977). In addition, the Supreme Court itself

cast some doubt on the matter in a recent case involving unrelated challenges to the Ohio unemployment compensation statute, *see* note 5 *supra*, where, without mentioning *Kimbell* or any of the three decisions interpreting it, the Court by footnote indicated that, the parties not having raised the issue, it was not considering or deciding the question whether a lockout exception to a labor dispute disqualification clause "conflicts with or is pre-empted by any provision of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*" *Ohio Bureau of Employment Services v. Hodory*, 431 U. S. 471, 475 n. 3, 97 S. Ct. 1898, 1902, 52 L.Ed.2d 513 (1977). Since the effect of *Kimbell* on the Maryland statute is thus far from clear, we rest our decision with respect to the preemption issue on what we perceive to be the application of principles set out in the Supreme Court's *Lodge 76* decision rather than on that Court's summary dismissal in *Kimbell.*

Since we conclude that the statutory provision in dispute does not disqualify the claimants, and that its operation does not contravene federal labor policy, compensation was properly awarded.

> *Judgment of the Circuit Court for Prince George's County affirmed.*
>
> *Costs to be paid by the appellants.*