C. Scott ZECHES, Petitioner-Appellee,

v.

IOWA DEPARTMENT OF JOB SER-
VICE, Respondent-Appellant.

No. 2–68069.

Court of Appeals of Iowa.

Jan. 26, 1983.

Walter F. Maley, Blair H. Dewey, and Edmund Schlak, Jr., Des Moines, for respondent-appellant.

Martin Ozga, Des Moines, for petitioner-appellee.

SNELL, Judge.

This case concerns whether petitioner, a Quik Trip store manager, was legally denied unemployment benefits for using vulgar language that constituted misconduct. The incident that triggered his discharge occurred sometime after 6:00 a.m. at the store. The company auditor had been working all night on an inventory when petitioner arrived for work about 6 a.m. A Pepsi vendor friend came in, noticed the auditor and asked petitioner what he was doing there again since petitioner's store had been inventoried the day before. The petitioner responded, "The stupid motherfuckers in the office just can't get their head out of their ass, they don't know what's going on." The auditor heard the

remark, although he was some forty feet away at the back of the store, the farthest point from the cash register where petitioner was standing. Two other people, customers, were in the store and were closer to petitioner than the auditor.

Petitioner was discharged for "talking that way to customers and vendors we deal with." The Job Service Appeal Board denied petitioner's application for unemployment benefits on the ground he was guilty of misconduct. The district court reversed.

The principles with regard to our review of administrative decisions are set forth in *Gipson v. Iowa Department of Job Service,* 315 N.W.2d 834, 836 (Iowa Appeal 1981). The laws for application here are section 96.5(2)(a) (Iowa Code 1981) and 370 I.A.C. 4.32(1)(a). The agency rule states:

Misconduct is defined as a deliberate act or omission by a worker which constitutes a material breach of the duties and obligations arising out of such worker's contract of employment. Misconduct as the term is used in the disqualification provision as being limited to <u>conduct evincing such willful or wanton disregard of an employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of employees,</u> or in carelessness or negligence of such degree of recurrence as to manifest equal culpability, wrongful intent or evil design, or to <u>show an intentional and substantial disregard of the employer's interests</u> or of the employee's duties and obligations to the employer.

(emphasis added). We focus on the underlined language.

At the hearing petitioner initially allowed "it could be highly possible" he said the specific words attributed but later equivocated that it was his word against the auditor's. The Pepsi vendor said no vulgar language was used in front of any customer and one of the customers stated that he failed to remember hearing the statements.

At a manager's meeting two or three weeks before the store incident, petitioner made derogatory statements to other people to see if they would get back to his supervisor. They did, and were considered not very respectful by the supervisor. Petitioner was counseled at this time by his supervisor who felt petitioner degraded everyone but himself. The day before the store incident, this supervisor talked to petitioner for about an hour concerning his conversations to other employees. Petitioner was then told he should be very careful in his communications with other employees because sometime he would say something that could result in his termination of employment.

The agency's interpretation of misconduct as reflected by I.C.A. 4.32(1)(a) was approved by the supreme court in *Huntoon v. Iowa Department of Job Service,* 275 N.W.2d 445, 448 (Iowa 1979). In applying this standard to the facts, the appeal board found that petitioner's actions were clearly misconduct. Although the trial court noted that this conclusion was not further explained, that flaw is not decisive.

Our task is to review the record as a whole to determine if the agency's decision is supported by substantial evidence and comports with the applicable rules of law. *Cook v. Iowa Department of Job Service,* 299 N.W.2d 698, 700 (Iowa 1980) While the court is not bound by the agency's interpretation of the law, it may give great weight to its conclusions, deferring to its expertise. *American Homes Products Corp. v. Iowa State Board of Tax Review,* 302 N.W.2d 140, 142 (Iowa 1981).

From our review we find that misconduct is established by petitioner's actions as being conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of employees. Petitioner was specifically warned the day before about his past conduct and was put on notice that such conduct in the future could result in his dismissal. We do not find it fatal that specific directions as to the type of conduct proscribed were not given. We conclude the agency's decision is

entitled to be upheld and the district court erred in deciding that misconduct was not shown as a matter of law.

REVERSED AND REMANDED FOR ENTRY OF JUDGMENT.

All judges concur except OXBERGER, C.J., and SCHLEGEL, J.

SCHLEGEL, Judge (dissenting).

I dissent.

The majority finds that petitioner engaged in misconduct sufficient to deny him unemployment benefits when he was overheard in a conversation with a friend using deprecatory language in referring to his superiors. Petitioner showed poor judgment in making his tasteless remarks, and his employer undoubtedly had the right to discharge him. I believe, however, that the majority errs in this case in equating conduct that could properly result in discharge with "misconduct," as the term is administratively defined, which results in being disqualified from receiving unemployment compensation.

Several jurisdictions have made this distinction between "dischargeable" conduct and conduct resulting in a denial of benefits. In *City of Dallas v. Texas Employment Commission*, 626 S.W.2d 549 (Tex.Ct. App.1981), the court held that an employee's refusal to take a polygraph test did not constitute misconduct within the meaning of the unemployment compensation statute, even though that employee could have been and was justifiably discharged from his position for such refusal. The court said:

Conduct constituting good cause for termination of employment does not necessarily equate with conduct disqualifying one from the benefits of [the unemployment compensation statute]. To constitute the latter, the acts or omissions must rise to the level of misconduct, which generally requires wrongful intent, bad faith or wanton disregard of the employers' interests (citations).

626 S.W.2d at 551. In a different factual setting, the New York court stated: "Nor does the refusal to work overtime necessarily constitute misconduct warranting deprivation of unemployment insurance benefits, even if the employer is entitled to discharge the employee for the refusal (citations). Every discharge for cause does not mean that the cause constitutes misconduct, although it may (citations)." *Hulse v. Levine,* 41 N.Y.2d 813, 814, 393 N.Y.S.2d 386, 386–87, 361 N.E.2d 1034, 1035 (1977). *See also Silva v. Nelson,* 31 Cal.App.3d 136, 141, 106 Cal.Rptr. 908, 910 (1973); *Hawkins v. District Unemployment Compensation Board,* 381 A.2d 619, 622 (D.C.1977); *Batts v. Review Board of Indiana Employment Security Division,* 179 Ind.App. 405, 385 N.E.2d 1174, 1175 n. 1 (Ind.Ct.App.1979); *South Central Bell Telephone Co. v. Sumrall,* 414 So.2d 876, 877 (La.Ct.App.1982); *Garfield v. Director of Division of Employment Security,* 377 Mass. 94, 95, 384 N.E.2d 642, 643 (1979); *Blake v. Commonwealth, Unemployment Compensation Board of Review,* 56 Pa.Commw. 358, 362–63, 425 A.2d 43, 45 (1981); *Johnson v. Department of Employment Security,* 138 Vt. 554, 556, 420 A.2d 106, 107 (1980).

The facts of this case provide an appropriate setting for applying the distinction explained above. We do not question the employer's ability to discharge petitioner— the employer subjectively determined that petitioner's comments were personally offensive, especially in light of past comments, and merited disciplinary action of some sort; in this case, discharge. It is quite another thing, however, to assume, as the majority apparently does, that these comments constitute "misconduct" under the more rigorous and objective definition of the term as spelled out in 370 I.A.C. § 4.32(1)(a). Petitioner's comments reflected only his personal displeasure with his employer; they did not affect in any significant way the employer's interest, nor did they impinge on petitioner's duties and obligations to his employer. In other words, petitioner's conduct did not indicate a "willful or wanton disregard of [his] employer's interest" or "an intentional and substantial disregard of ... [his] duties and obligations to the employer." At most, his conduct would fall under the last sentence

of § 4.32(1)(a): "On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not deemed misconduct within the meaning of the statute." It must be remembered that no customers heard the language used by petitioner; he made the statements to a personal friend who was in the store at the time. I do not believe his conduct in this case rises to the level of misconduct required to deny him unemployment benefits.

In addition, I believe recognition of the distinction between conduct warranting discharge and that warranting denial of benefits is required after consideration of the public policy behind our unemployment compensation scheme. Iowa Code § 96.2 states that policy in the following terms:

> Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his or her family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

The Wisconsin Supreme Court has recognized the connection between the policies behind unemployment compensation and the necessity of making the distinction referred to above. *See Cheese v. Afram Brothers Co.,* 32 Wis.2d 320, 325, 145 N.W.2d 716, 719 (1966).

This policy argument is not vitiated by the fact that § 96.2 is directed to those who are unemployed "through no fault of their own." The Maryland court considered this issue and concluded:

> Finally, we reject the ... contention, that allowing the claimants to recover benefits would contravene the policy of the unemployment compensation statute. Although the declaration of policy ... speaks in terms of aiding "persons unemployed through no fault of their own," these words do not themselves establish a disqualification based on unemployment resulting from the "fault" of the claimant. Rather, the specific provisions ... enumerate those grounds the legislature has determined disqualify claimants from receiving benefits.

*MEMCO v. Maryland Employment Security Administration,* 280 Md. 536, 548, 375 A.2d 1086, 1093–94 (1977). Likewise in this case, it is not enough to say that petitioner was discharged for reasons that were not his "fault." Instead, we must make the further determination that he engaged in "misconduct" as defined by administrative rule before he may be denied unemployment benefits. I do not believe this determination may be made on the record in this case.

I would affirm the ruling of the district court.

OXBERGER, C.J., joins in this dissent.