**Donald E. MYERS, Appellant,**

v.

**EMPLOYMENT APPEAL BOARD, Appellee.**

No. 89–1058.

Court of Appeals of Iowa.

Sept. 26, 1990.

Mark S. Soldat, Algona, for appellant.

William C. Whitten and I. John Rossi, Des Moines, for appellee.

Heard by OXBERGER, C.J., and SCHLEGEL and SACKETT, JJ., but considered en banc.

DONIELSON, Judge.

Donald Myers had been employed by Lauridsen Foods, Inc. for nine years. He was the supervisor of maintenance. Lauridsen Foods is a packer of pork products.

Armour Foods was Lauridsen's biggest customer. Jody East was the head of Armour Foods' Quality Assurance Department. As part of her employment for Armour, East was present daily within the Lauridsen plant.

On Tuesday, February 9, 1988, Myers was asked by East to move some cabinets. Myers became irate in response to the request. After Ms. East had left the maintenance shop, Myers told one of his subordinates to "go up and see what the dumb bitch wanted." The subordinate, Robert Leerar, subsequently repeated this statement to Ms. East. Ms. East reported the altercation to Myers' superior, Clark Knowles, the next day.

On Thursday, February 11th, a janitor approached Mr. Knowles. The janitor was concerned because Myers had told him not to deliver supplies to the Armour staff located in the plant. Mr. Knowles testified that while he would not regard this incident by itself as significant, he did feel that under the circumstances it indicated Myers had an attitude problem toward Lauridsen's best customer. Following this incident, Mr. Knowles felt he should have a talk with Myers.

Mr. Knowles met with Myers on the eleventh. They discussed the incident involving Ms. East and the report by the janitor regarding the delivery of supplies to Armour. Knowles asked Myers to take some time off and return to work on the following Tuesday and they would discuss Myers' future with Lauridsen Foods. At this point, Myers began to discuss the possibility of quitting his job.

Fellow employee Ray Laurie testified that Myers spoke with him after he left his meeting with Knowles. Laurie stated that shortly after leaving Knowles' office, Myers was upset and said, "Well, I'm through but I'll be back Tuesday and when I come back Tuesday I will make it so miserable they will fire me." Laurie subsequently repeated this statement to Mr. Knowles.

Myers returned to the workplace on Tuesday, February 16th. He was met by Knowles and was informed his employment was terminated. Myers sought unemployment benefits. Following a hearing, Myers was denied benefits. The hearing officer concluded Myers had voluntarily quit his job without good cause attributable to his employer. In the alternative, the hearing officer concluded Myers' conduct was such that he had been discharged for misconduct in light of his threat to behave so miserably so as to force his employer to fire him.

On appeal, the Employment Appeal Board affirmed the denial of benefits but modified the decision of the hearing officer. The Board concluded this case involved a discharge resulting from employee misconduct rather than a voluntary quit. The Board determined Myers' statement to Laurie was a threat which constituted misconduct.

Myers sought judicial review. The district court concluded substantial evidence supported the agency's decision and it was not affected by error of law. On appeal, Myers claims the trial court erred by affirming the agency's decision.

■ I. *Standard of Review.* Our scope of review in cases arising out of the Iowa Administrative Procedure Act is limit-

ed under Iowa Code section 17A.20 to the correction of errors at law. *Foods, Inc. v. Iowa Civil Rights Commission*, 318 N.W.2d 162, 165 (Iowa 1982). The review function of the district court under section 17A.19 is to correct errors of law which are specified in section 17A.19(8). When we review decisions of the district court which were rendered in its capacity as an appellate body under section 17A.19, the issue for our determination is whether the district court correctly applied the law. *Budding v. Iowa Department of Job Service*, 337 N.W.2d 219, 221 (Iowa App.1983). In order to make that determination, we apply the standards of section 17A.19(8) to the agency action to determine whether this court's conclusions are the same as those of the district court. *Jackson County Public Hospital v. Public Employment Relations Board*, 280 N.W.2d 426, 429–30 (Iowa 1979).

II. *Misconduct.* Iowa Code section 96.-5(2) provides a claimant is disqualified from unemployment benefits "[i]f the department finds that the individual has been discharged for misconduct in connection with the individual's employment." The sole issue before us is whether the department erred in holding petitioner's conduct constituted misconduct as that term is contemplated under section 96.5(2). We note at the outset that we do not question the employer's right to terminate petitioner's employment. The issue we address relates solely to whether or not petitioner is entitled to unemployment compensation.

Misconduct is defined by 345 Iowa Administrative Code 4.32(1) as:

[A] deliberate act or omission by a worker which constitutes a material breach of the duties and obligations arising out of such worker's contract of employment. Misconduct as the term is used in the disqualification provision as being limited to conduct evincing such willful or wanton disregard of an employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has a right to expect of employees, or in carelessness or negligence of such degree of recurrence as to manifest equal culpability, wrongful in-

tent or evil design, or to show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed misconduct within the meaning of the statute.

This definition has been accepted by the Iowa Supreme Court as accurately reflecting the intent of the legislature. *Huntoon v. Iowa Dept. of Job Service*, 275 N.W.2d 445, 448 (Iowa 1979), *cert. denied*, 444 U.S. 852, 100 S.Ct. 105, 62 L.Ed.2d 68 (1979).

As the definition suggests, misconduct must be substantial in nature to support a disqualification from unemployment benefits. Misconduct serious enough to warrant the discharge of an employee, is not necessarily serious enough to warrant a denial of benefits. *Budding*, 337 N.W.2d at 222. An employer has the burden of proving a claimant is disqualified for benefits because of misconduct. *Sallis v. Empt. Appeal Board*, 437 N.W.2d 895, 896 (Iowa 1989).

III. *Offensive Language.* The record reveals that Myers referred to an Armour Foods employee, Jody East, as a "dumb bitch." Relying on *Budding v. Iowa Dept. of Job Service*, 337 N.W.2d 219 (Iowa App. 1983), Myers claims this language would not constitute misconduct. Seven years have passed since *Budding* was rendered, and this court has had to repeatedly make exceptions to its "minor peccadillo" analysis. We have recognized that vulgar language in front of customers can constitute misconduct, *Zeches v. Iowa Dept. of Job Service*, 333 N.W.2d 735, 736 (Iowa App. 1983), as well as vulgarities accompanied with a refusal to obey supervisors. *Warrell v. Iowa Dept. of Job Service*, 356 N.W.2d 587, 589 (Iowa App.1984). Likewise, the repetition of vulgarities can elevate a minor peccadillo to an act of willful misconduct. *Carpenter v. Iowa Dept. of*

*Job Service,* 401 N.W.2d 242, 245–46 (Iowa App.1986).

Each decision qualifying or limiting *Budding* is an implicit recognition of the erroneous analysis adopted in that decision. This court recognizes an employer's right to expect decency and civility from its employees. In Myers' case, the vulgar language he used was subsequently conveyed to Ms. East and could have damaged the business relationship between Lauridsen and Armour Foods. The use of profanity or offensive language in a confrontational, disrespectful, or name-calling context, may be recognized as misconduct, even in the case of isolated incidents or situations in which the target of abusive name-calling is not present when the vulgar statements are initially made. The question of whether the use of improper language in the workplace is misconduct is nearly always a fact question. It must be considered with other relevant factors, including the context in which it is said, and the general work environment. Therefore, whether the event is misconduct is most generally a decision for the agency. To the extent *Budding* contradicts this position, it is overruled.

IV. *Threat.* The record in this case reveals the agency denied Myers unemployment benefits because of the statement he made in which he alleged he would return to work and make it "so miserable" his employer would fire him. We agree that this threatening behavior constitutes misconduct.

Our past decisions have recognized that employee threats may rise to the level of behavior so as to constitute misconduct. *See Deever v. Hawkeye Window Cleaning, Inc.,* 447 N.W.2d 418, 421 (Iowa App.1989) (threat of physical harm); *Myers v. Iowa Dept. of Job Service,* 373 N.W.2d 507, 510 (Iowa App.1985) (threat not to take orders from coworker). When reviewing an alleged act of misconduct, we may consider past acts of misconduct to determine the magnitude of the current act. *Kelly v. Iowa Dept. of Job Service,* 386 N.W.2d 552, 554 (Iowa App.1986).

In this case, Myers conceded he "blew his stack" on February 9, 1989, when Jody East requested that some cupboards be moved. Ms. East was a representative of Armour Foods, Lauridsen's largest customer. Maintenance of a good relationship with Armour employees was very important to Lauridsen Foods. Despite that fact, Myers became irate and abusive to Ms. East, and two days later he prevented a janitor from helping to deliver supplies to Armour staff.

These past incidents were potentially harmful to Lauridsen's relationship with Armour Foods and provide some indication of the harm Myers could inflict if allowed to carry out his threat to make things miserable for his employer. An employer need not wait until an employee has acted on his declared intent before the threatened conduct rises to the level of misconduct. *Myers,* 373 N.W.2d at 510. Myers' behavior on February 9th and 11th culminated in a reprimand by his employer. Myers then threatened to make things so miserable it would result in his termination. Without question this conduct constitutes a deliberate and willful disregard of the employer's interests and the standards of behavior which an employer has the right to expect of employees. Myers was correctly denied unemployment benefits.

AFFIRMED.

All Judges concur except SACKETT, J., who specially concurs, and SCHLEGEL, J., and OXBERGER, C.J., who dissent.

SACKETT, Judge (specially concurring).

I concur in all respects with the majority opinion. I write specially to clarify my position on one issue. I share the dissenters' concern that our system for providing unemployment remains strong. Unlike the dissenters, I do not interpret the majority opinion as eroding these rights. I think the dissenters have overreacted in so holding.

SCHLEGEL, Judge (dissenting).

For reasons I detail below and which I have discussed elsewhere, *see Carpenter v.*

*Iowa Dep't of Job Serv.*, 401 N.W.2d 242, 246–47 (Iowa App.1986) (Schlegel, J., dissenting), I respectfully dissent.

## I.

*A.* In 1983, in *Budding v. Iowa Dep't of Job Serv.*, 337 N.W.2d 219 (Iowa App.1983), this court examined the issue of whether an isolated incident of vulgar language in the workplace is sufficient misconduct to justify denial of unemployment benefits. That case addressed an incident of alleged misconduct much like the case before us. Budding had received a warning for a safety violation and another for allegedly unsafe operation of his bicycle on plant grounds. He was dismissed after a brief incident that culminated in his referring to his supervisor as a "dirty bitch."

I concur in the majority's statements concerning the law on misconduct. In fact, the majority adopts almost verbatim *Budding's* language outlining our scope of review and case law on misconduct. It seeks, however, to overturn *Budding's* holding, which states:

> Where the use of vulgar language is an isolated incident in an environment where decorous language is not required and is not occasioned by a deliberate refusal to obey a reasonable directive, we are inclined to view it as a minor peccadillo. This is in accord with our oft-stated position that Code provisions which operate to work a forfeiture of benefits are strictly construed in favor of the claimant.

*Budding*, 337 N.W.2d at 222. The majority states instead:

> The use of profanity or offensive language in a confrontational, disrespectful, or name-calling context, may be recognized as misconduct, even in the case of isolated incidents or situations in which the target of abusive name-calling is not present when the vulgar statements are initially made. The question of whether the use of improper language in the workplace is misconduct is nearly always a fact question. It must be considered with other relevant factors, including the context in which it is said, and the gener-

al work environment. Therefore, whether the event is misconduct is most generally a decision for the agency. To the extent *Budding* contradicts this position, it is overruled.

*Supra* at 738.

*B.* I strongly disagree with the majority and concurring opinions that *Budding* should be overruled. This is an unwarranted and needless attack on a precedent that has served as a backstop against zealous denial of benefits to individuals who have committed, as *Budding*, terms it, a "minor peccadillo," that is, a petty sin. Not only does this decision, which easily could have been decided within the language of *Budding* or *Carpenter*, break faith with our case law, it clouds, rather than casts light, on the issue. Despite our statements "that Code provisions which operate to work a forfeiture of benefits are strictly construed in favor of the claimant," *Budding*, 337 N.W.2d at 222, we turn our backs and make it easier to deny unemployment benefits—not just employment—because of a "petty sin."

The majority concedes that "[t]he issue we address relates solely to whether or not petitioner is entitled to unemployment compensation," *supra* at 737; *see Budding*, 337 N.W.2d at 221, and that "[m]isconduct serious enough to warrant the discharge of an employee, is not necessarily serious enough to warrant a denial of benefits." *Supra* at 737 (citing *Budding*, 337 N.W.2d at 222). Yet, the basis for its conclusion seems to be "an employer's right to expect decency and civility from its employees." *Supra* at 738.

The majority accurately states that employers may expect their employees to act, or to refrain from acting, in certain ways. We did not condone the type of behavior at issue before us in *Budding*, *see* 337 N.W.2d at 222, and we should not condone it now. Nevertheless, in one fell swoop, the majority leaps from allowing employers to fire employees on this nebulous standard of "decency and civility," which authority I do not dispute, to denying unemployment benefits on the basis of the ambiguous per se test quoted above.

As we stated in *Budding* and the majority reiterates here, "willful or wanton desregard of an employer's interest," 370 Iowa Administrative Code 4.32(1), requires that "the misconduct must be *substantial* ", *supra* at 737 (emphasis supplied); *Budding*, 337 N.W.2d at 222, to support denial of benefits. The approach the court adopts today thoroughly confounds our longstanding practice of evaluating alleged misconduct on different scales, one for the employment relationship and one for the award or denial of unemployment benefits. Despite the majority's statement to the contrary, gone is the idea that "[m]isconduct serious enough to warrant the discharge of an employee, is not necessarily serious enough to warrant a denial of benefits." *Supra* at 737 (citing *Budding*, 337 N.W.2d at 222). As I discuss further in Division II, the effect will be to allow employers to establish the criteria for unemployment benefits.

I also take issue with the majority's statement that what constitutes "misconduct" is a fact question. This is clearly inaccurate. We have only recently stated that such a "question ... is one of law: whether the facts fit the legal definition of misconduct under Iowa law." *Miller v. Employment Appeal Bd.*, 423 N.W.2d 211, 212 (Iowa App.1988). It is abundantly clear that "misconduct" is an empty vessel into which we must pour meaning, guided by statutory and administrative definitions and our case law. Although the agency presides as fact-finder—to determine whether the statutory elements exist, it remains our non-delegable duty to determine whether the law was properly applied. Iowa Code § 17A.19(8) (1989). The question whether an act or omission fits the legal definition of "misconduct" is a matter of law for the courts to decide. Although courts occasionally refer to misconduct as a fact question, they mean the presence of the basic elements of "misconduct" and inevitably reserve to themselves an evaluation of whether the legal definition was correctly applied to the facts. *See, e.g., Fairfield Toyota, Inc. v. Bruegge*, 449 N.W.2d 395, 397 (Iowa App.1989); *Miller*, 423 N.W.2d at 212; *Engler v. Marshall Turkey Plant*, 409 N.W.2d 570, 573 (Minn.

App.1987); *Garman v. State Employment Security Dep't*, 102 Nev. 563, 729 P.2d 1335, 1336 (1986); *Sanchez v. New Mexico Dep't of Labor*, 109 N.M. 447, 786 P.2d 674, 677–78 (1990); *Blueshield v. Job Service North Dakota*, 392 N.W.2d 70, 73 (N.D. 1986); *Stagner v. Board of Review*, 792 P.2d 94, 95 (Okla.App.1990); *Peterson v. Employment Security Dep't*, 42 Wash. App. 364, 711 P.2d 1071, 1074 (1985).

*C.* The majority is mistaken in finding that because *Budding* can be distinguished, *see Warrell v. Iowa Dep't of Job Serv.*, 356 N.W.2d 587, 589 (Iowa App.1984) (vulgarities directed at supervisors by employee serving probationary period accompanied by refusal to obey reasonable instructions); *Carpenter v. Iowa Dep't of Job Serv.*, 401 N.W.2d 242, 245–46 (Iowa App.1986) (repeated incidents of abusive language directed at supervisor), its analysis is erroneous. In fact, the court uses the same analysis to reach its conclusion today, except that it ignores the requirement of "willful or wanton disregard," which it notes "has been accepted by the Iowa Supreme Court as accurately reflecting the intent of the legislature." *Supra* at 737 (citing *Huntoon v. Iowa Dep't of Job Serv.*, 275 N.W.2d 445, 448 (Iowa), *cert. denied*, 444 U.S. 852, 100 S.Ct. 105, 62 L.Ed.2d 68 (1979)).

Whether or not *Budding* was correctly decided on its facts, its test was easily applied. Under that test, we said we were disposed toward treating as a "minor peccadillo," or, as the Minnesota courts have called it, a "hotheaded incident," *see Mankato Lutheran Home v. Miller*, 358 N.W.2d 96, 98 (Minn.App.1984) (citing *Windsperger v. Broadway Liquor Outlet*, 346 N.W.2d 142, 145 (Minn.1984)), substandard employee behavior that includes vulgar language when:

(1) The use of vulgar language is an isolated incident;

(2) It occurs in an environment where decorous language is not required; and

(3) It is not occasioned by a deliberate refusal to obey a reasonable directive. *See Budding*, 337 N.W.2d at 222.

Applying *Budding*, the majority might have found that decorous and respectful

language was required in referring to Ms. East, thus failing the first part of the test. The majority might also have found Myers's interference with sending supplies to the Armour staff a refusal to obey a reasonable directive. Moreover, before we decided *Budding*, we recognized that vulgar language in front of customers can constitute misconduct, *Zeches v. Iowa Dep't of Job Serv.*, 333 N.W.2d 735, 736 (Iowa App.1983).

D. If we continue down this path requiring us to discount, if not ignore, the context or isolation of an incident, we almost certainly will find ourselves faced with the new task of softening the blow of such a harsh rule. This rule makes no provision for isolated "hot-headed" incidents, *see Gunn v. Gerace*, 516 So.2d 1180, 1181 (La.App. 2d Cir.1987) (name-calling and profanity to comptroller did not amount to disqualifying conduct), *cf. Carpenter v. Iowa Dep't of Job Serv.*, 401 N.W.2d 242 (Iowa App.1986) (several times telling supervisors "kiss my ass" raised incidents to disqualifying conduct), provoked or de minimus language, *see Reed v. Commonwealth*, 104 Pa.Cmwlth. 373, 522 A.2d 121, 123–24 (1987) (remanded for determination of whether "vulgar and offensive language coupled with the threat of physical violence" to supervisor was provoked or de minimus); *see also Mankato Lutheran Home v. Miller*, 358 N.W.2d 96, 98–99 (Minn.App.1984) (nurse's response to supervisor in presence of patients, "What the hell do you care [about my health]? ... I never had this goddamn pain until I came to this fucking hole," was isolated incident that was partially provoked), raised voice or disrespectful tone, *see Sheff v. Board of Review*, 128 Ill.App.3d 347, 83 Ill.Dec. 624, 626–7, 470 N.E.2d 1044, 1046–47 (5th Dist.1984) (finding raised voice and disrespectful tone to supervisor did not rise to level sufficient "to deprive plaintiff of his statutory right to unemployment compensation."), or a simple, nonvulgar "tantrum," *see Windsperger v. Broadway Liquor Outlet*, 346 N.W.2d 142, 145 (Minn. 1984) (finding nonvulgar "tantrum" directed at manager to be " 'a mere mistake or error in judgment—"a minor peccadillo" ' "

(quoting *Silva v. Nelson*, 106 Cal.Rptr. 908, 911, 31 Cal.App.3d 136, 142 (1973))).

I do not advocate a "sticks and stones" test, but neither do I think that we should allow ourselves to go so far in the other direction that we may find ourselves or leave to the agency the task of evaluating every nuance of speech and intonation for evidence that it was "offensive" or "disrespectful," or worse yet, within the employer's expectations of "decency and civility." *See, e.g., Sheff*, 83 Ill.Dec. at 626–7, 470 N.E.2d at 1046–47 (raised voice and disrespectful tone); *Windsperger*, 346 N.W.2d at 145 (nonvulgar "tantrum"). Parade of horribles to one side, this leaves too much to chance and puts too much discretion in the hands of employers.

## II.

In the current atmosphere of our state where employment "at will" finds great support, the majority now places in the hands of the employer, the ability to destroy the remaining safeguard against the ravages of unemployment. Allowed to stand, the rule the majority announces today empowers employers not only to discharge employees for any reason, but to selectively deny unemployment benefits based upon the words the employee speaks. I submit that this is an interpretation of the law, which can lead to the ultimate destruction of unemployment compensation.

The statutory language of the unemployment compensation statutes dwells upon the purpose of the law to relieve the hardship of unemployment. The law is primarily aimed at the relief of the hardship to the worker and his family. The system's genesis was for that purpose and also to act as recession proofing by sustaining the purchasing power of those whose jobs had disappeared. Without that purchasing power, employers also disappeared, resulting in still further unemployment and a depressed economy. We must use caution that we do not provide the means for the destruction of the program. The majority takes a giant step in that direction by its opinion in this case.

In this day of more affluence and greater consumption, the majority obviously fails to see the need for a diligent guarding of the principles of the program of unemployment insurance, and finds itself in a position to restrict its benefits. Note well, the inroad that the majority creates today will be put into effect more and more by the unscrupulous employers. Undecorous language will become the future rationale for denial of benefits. *Budding* was the thin line of protection of the program. I predict that with it removed, the abuse of the system will be rampant.

For the foregoing reasons, I would reverse the appeal board's denial of benefits and would remand the case to the agency for the determination of the amount of benefits.

OXBERGER, C.J., joins this dissent.