IBP, INC., Petitioner–Appellant,

v.

**IOWA DEPARTMENT OF NATURAL RESOURCES, Respondent–Appellee.**

No. 93–0061.

Court of Appeals of Iowa.

Feb. 25, 1994.

Hugh J. Cain of Hopkins & Huebner, P.C., Des Moines, for appellant.

Bonnie J. Campbell, Atty. Gen., and David R. Sheridan, Asst. Atty. Gen., for appellee.

Heard by SCHLEGEL, P.J., and SACKETT and HABHAB, JJ.

HABHAB, Judge.

IBP, Inc. (IBP) appeals a district court ruling affirming the Environmental Protection Commission's decision regarding a National Pollutant Discharge Elimination System (NPDES) permit regulating IBP's discharge of wastewater.

IBP operates a hog processing facility and wastewater treatment plant that discharges pollutants through two outfalls. One outfall discharges pollutants into the Iowa River, located to the west of the facility, and the other discharges into the Cedar River, located to the east of the facility. The IBP facility is located between the two rivers and just upstream from the juncture of the Iowa and Cedar Rivers.

In 1986 the Iowa Department of Natural Resources (DNR) granted IBP a permit to operate the wastewater treatment plant and to discharge pollutants into the Cedar and Iowa Rivers. Pollutants may not be discharged into waterways except for adequately treated pollutants discharged pursuant to a permit from the DNR. *See* 567 Iowa Admin.Code 62.1(1). In accordance with its 1986 permit, IBP discharged into the main channel of the Cedar River. About 200 feet downstream, however, the flow is diverted to a "cutoff" channel. The cutoff stretches for approximately 550 feet and then separates into three fingers which flow through an island called Rabbit Island. The three fingers flow into the Iowa and Cedar Rivers. Approximately forty-seven percent of the flow of the Cedar River goes through this cutoff.

In July 1989 the DNR informed IBP it was amending IBP's permit. IBP proposed a work plan for the mixing zone study that was to be conducted by its contractor, the Advent Group. The DNR informed IBP its work

plan needed to include flow data from the cutoff channel, as well as from the Cedar River. In December 1989, accompanied by representatives from the DNR and IBP, Advent conducted the study of the mixing zones. At that time, Ralph Turkle, an environmental engineer for the DNR, noticed one of the three fingers of the cutoff channel had closed since May 1989. Advent attempted to simulate the mixing conditions in the Cedar's main channel if the cutoff were to close and its water flow was diverted to the main channel. Advent injected dye east of the tip of Rabbit Island in the main channel of the Cedar to the same width of the dye plume that had been earlier observed in the cutoff and at the same distance downstream. Measurements were taken and dispersion ratios calculated. The study conducted in the main channel, however, did not, and could not, simulate the increased flow and mixing characteristics that would occur if the cutoff closed.

The DNR used Advent's study to determine the discharge limits for each river and issued a draft copy of IBP's permit on April 13, 1990. The limits set forth in the drafted permit for the Cedar river were based on the mixing conditions found in the Cedar's main channel. The calculations used to determine effluent limits in this draft permit assumed all of IBP's discharge would be to one river or the other.

On May 14, 1990, IBP responded to the draft permit, objecting to the prohibition against simultaneous discharges. IBP requested a modification of the limits based on permanent, simultaneous discharges into both the Iowa and Cedar. IBP also questioned whether the cutoff channel should have been used instead of the main channel in determining the effluent limits for the Cedar River. On May 30, 1990, the DNR granted IBP's request for simultaneous discharges and informed IBP the information would be provided to the public at a hearing. A public hearing on the draft permit was held on June 5, 1990. The issue of simultaneous discharges was raised at the hearing but the issue of the proper mixing zone for the Cedar River was not raised. It was not until June 25, 1990, and July 9, 1990, that Advent and IBP again questioned the DNR's reliance upon the Cedar's main channel as the mixing zone for the purpose of determining effluent limits. Advent and IBP contended the use of the Cedar's main channel mixing conditions was improper because the actual mixing conditions occurred in the cutoff.

In August 1990 the DNR issued permit No. 58–00–1–00 requiring IBP comply with the conditions set for in the permit. The effluent limits set forth in the permit were based on the mixing conditions in the Cedar's main channel. The permit allowed for simultaneous discharges but imposed a single effluent limitation upon both rivers. Based on IBP's request for simultaneous discharges and the fact IBP has only one treatment facility and, thus, can only treat to one effluent quality, the DNR calculated a single effluent concentration based on the more restrictive flow pattern of the Cedar.

IBP objected, contending the use of the Cedar's main channel mixing conditions was improper because the actual mixing occurred in the cutoff. It also contended the DNR improperly imposed a limit on its discharges into the Iowa based on flow data from the Cedar and argued the DNR should have set individual effluent limits for each river.

After a hearing, the administrative law judge (ALJ) issued a proposed opinion upholding the conditions of the NPDES permit. The ALJ noted the cutoff had nearly closed since the permit issued. Because there was no reliable method of calculating the actual mixing conditions in the main channel if the cutoff completely closed, the ALJ concluded the use of the Cedar's main channel mixing zone was not unreasonable. The ALJ also found the single concentration limit for both rivers was a result of IBP's request and was not unreasonable given IBP could only treat its wastewater to one effluent quality.

The Environmental Protection Commission affirmed the ALJ. IBP sought judicial review. The district court also affirmed. IBP now appeals.

■ Our review is at law. *Furry v. Iowa Dep't of Transp.*, 464 N.W.2d 869, 870 (Iowa 1991) (citation omitted). We review the record to determine if the agency's decision is

supported by substantial evidence and comports with the applicable rules of law. *Zeches v. Iowa Dep't of Job Serv.*, 333 N.W.2d 735, 736 (Iowa App.1983) (citation omitted). We are bound by fact findings of an agency which are supported by substantial evidence on the record as a whole. *Arkansas v. Oklahoma*, —— U.S. ——, ——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239, 259 (1992) (citation omitted); *Bearce v. FMC Corp.*, 465 N.W.2d 531, 534 (Iowa 1991). Although we are not bound by the agency's interpretation of the law, we may give great weight to its conclusions. *Zeches*, 333 N.W.2d at 736 (citation omitted).

■ I. IBP contends the DNR used the wrong mixing zone to determine the effluent limits for the Cedar River outfall. IBP argues the DNR improperly used the main channel of the Cedar River, and instead should have used the cutoff channel as the *mixing* zone.

The regulatory mixing zone is defined as a delineated portion of a stream or river in which wastewater discharges are allowed to combine and disperse into the water body. 567 Iowa Admin.Code 60.2, 61.2(4). Rule 61.2(4)(a) provides:

> Due to extreme variations in wastewater and receiving water characteristics, spatial dimensions of mixing zones shall be defined on a site-specific basis. *These rules are not intended to define each individual mixing zone,* but will set maximum limits which will satisfy most biological, chemical, physical and radiological considerations in defining a particular mixing zone. Additional details are noted in the "Supporting Document for Iowa Water Quality Management Plans," Chapter IV, July 1976, as revised on March 20, 1990, for considering unusual site-specific features such as side channels and sand bars which may influence a mixing zone.

567 Iowa Admin.Code 61.2(4)(a) (emphasis added). Chapter IV states the mixing zone procedures contained therein "provide *guidance* on the methods to be used in considering a mixing zone while determining applicable effluent limitations for a wastewater discharge." *Supporting Document for Iowa*

*Quality Management Plans,* Chapter IV, at p. 69 (rev. ed. 1990) (emphasis added).

The record shows the DNR used the mixing zone from the main channel of the Cedar rather than the cutoff to determine effluent limits. The DNR's decision was based, in part, on the study data that indicated the main channel mixing zone required more conservative permit limits than the cutoff. The condition of the cutoff was also considered. The record indicates the cutoff did not exist until sometime after the initial NPDES permit was issued in 1986. At the August 1991 hearing before an ALJ, DNR regional staff reported that at the time of the December 1989 study it was noted part of the cutoff channel had closed since May 1989. There was also hearsay testimony admitted from the DNR that after the permit was issued in August 1990 the cutoff channel was nearly closed.

The mixing zone is to be determined in one of two manners, by actual field measurements at low stream flow conditions or by use of a dispersion model. *Supporting Document for Iowa Quality Management Plans,* Chapter IV, at p. 71 (rev. ed. 1990). In this case Advent simulated the mixing zone of the main channel by injecting dye to the same width of the dye plume that had been earlier observed in the cutoff and at the same distance downstream. Advent took measurements and calculated dispersion ratios.

The agency decision stated the simulation was the best option available because it was impossible to model the actual mixing conditions that would occur if the effluent flow went to the main channel, without actually closing the cutoff. The ALJ found Advent's simulation of the mixing zone in the main channel of the Cedar River failed to take into consideration the increased velocity and increased mixing which would occur in the main channel if the cutoff channel was closed. The ALJ stated, however, there was insufficient evidence to conclude if the cutoff completely closed the mixing characteristics of the main channel would increase to a level which would allow permit limits in double the amount set forth in the August 1990 permit. The ALJ concluded it was reasonable, in light of the DNR's legitimate concerns of

avoiding water quality violations if the cutoff closed, to rely on the main channel data to determine effluent limits.

The policy statement to the Water Quality Standards chapter in the Iowa Administrative Code provides the Environmental Protection Commission "will attempt to prevent and abate the pollution of all waters to the fullest extent possible consistent with statutory, and technological limitations." 567 Iowa Admin.Code 61.2(1). As the district court noted: "The regulations set forth by the commission are not intended to define each individual mixing zone." The ALJ concluded: "Nothing in the department's statutes or regulations entitles [IBP] to always have the maximum possible effluent limits for its NPDES permit."

We conclude the agency decision to use the main channel as the mixing zone in determining the effluent limits governing IBP's facility is supported by substantial evidence. We find no errors of law and affirm on this issue.

■ II. IBP contends the trial court erred in allowing the DNR to impose a single concentration limit on both the Iowa and Cedar Rivers. IBP argues the DNR is required to set individual effluent concentrations for each river, citing the following:

> Waters at and beyond mixing zone boundaries shall meet all applicable standards and the chronic and human health criteria of subrule 61.3(3), Tables 1 and 3, *for that particular water body* or segment.

567 Iowa Admin.Code 61.2(4) (emphasis added).

In the second draft of the permit issued on April 13, 1990, the DNR imposed different concentration limits on the wastewater discharged into the separate rivers. The draft prohibited simultaneous discharge from both outfalls. IBP objected to the April 13 draft, requesting effluent limits based on permanent, simultaneous discharge from both outfalls.

> IBP requests removal of the applicable permit language that prohibits simultaneous discharge to both outfalls.

. . . . .

IBP requests the water quality based permit limits to be based on a permanent, simultaneous flowrate to both outfalls. We propose design flow rates of 1.05 mgd [million gallons per day] and 0.75 mgd to Outfalls 001 and 002, respectively.

The DNR granted IBP's specific request to allow simultaneous discharge from both outfalls. In doing so the DNR used the more stringent concentration limit from the Cedar River upon both rivers.

Because IBP had the option to simultaneously discharge into both rivers and IBP's single treatment plant can treat to one single effluent quality only, the DNR chose to use the more stringent concentration limit for both outfalls. The ALJ's decision, which was affirmed by the Environmental Protection Commission, stated: "If there is to be simultaneous discharge to both outfalls, the effluent quality must be the most restrictive to the concentration limits for the two rivers, in order to meet water quality standards." The decision cited Iowa Code section 455B.173(3) which authorizes the Environmental Protection Commission to adopt rules relating to the operation of waste disposal systems and discharge of pollutants into the waters of this state. Iowa Code § 455B.173(3) (1991). Iowa Code section 455B.174(4) provides, in part:

> A permit shall not be issued to operate or discharge from any disposal system unless the conditions of the permit assure that any discharge from the disposal system meets or will meet all applicable state and federal water quality standards and effluent standards and the issuance of the permit is not otherwise prohibited by the federal Water Pollution Control Act.

Iowa Code § 455B.174(4) (1991) (now codified at Iowa Code § 455B.174(4)(b) (1993)). Rule 64.6(2) is also cited in the decision. The rule further provides each NPDES permit shall include any of the following that is applicable:

> f. Any other limitation, including those:
>
> (1) Necessary to meet water quality standards . . . established pursuant to any Iowa law or regulation . . .
>
> (3) Required to implement any applicable water quality standard

567 Iowa Admin.Code 64.6(2) (now located at 567 Iowa Admin.Code 64.7(2)(f) (1993)).

The district court noted there is no argument the effluent limitations do not meet the water quality standards set forth in the rules of the administrative code. We find no error in the district court decision on judicial review. We affirm the decision to impose a single concentration limit.

**AFFIRMED.**