677 A.2d 87

**PROFESSIONAL STAFF NURSES ASSOCIATION**

v.

**DIMENSIONS HEALTH CORPORATION et al.**

**No. 1382, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

June 3, 1996.

Marley S. Weiss, Baltimore (Roger Schlossberg, Curtis Hane and Schlossberg & Associates, Hagerstown, on the brief), for appellant.

Stephen D. Shawe, Baltimore (Gary L. Simpler, Elizabeth Torphy–Donzella, Shawe & Rosenthal, Baltimore, Joseph B. Chazen and Meyers, Billingsly, Rosenbaum & Rodbell, P.A., Riverdale, on the brief), for appellees.

Argued before WENNER, MURPHY and EYLER, JJ.

EYLER, Judge.

The gradual deterioration of the collective bargaining process between labor and management resulted in labor giving notice to management of labor's intent to strike, and management, in anticipation thereof, seeking replacement workers. The Circuit Court for Prince George's County considered labor's complaint, in which labor alleged that the firm offering replacement workers to management had maliciously and wrongfully interfered with the economic relationship between labor and management, based on § 4–403 of the Labor and Employment Article (strikebreaker statute), and dismissed it under the doctrine of federal preemption and for failing to state a cause of action. Aggrieved with that result, labor exercised its prerogative and noted an appeal to this Court. For reasons discussed below, we shall affirm the judgment of the circuit court.

The parties to this dispute are members of the health-care industry. Dimensions Health Corporation, appellee ("Dimensions"), owns and operates health-care facilities in Maryland.

Professional Staff Nurses Association, appellant ("Professional"), is an unincorporated labor union that represents nursing professionals throughout Maryland, including approximately seven hundred registered nurses employed by Dimensions. The last party to this triangle is Favorite Nurses, Inc., appellee ("Favorite"), a company that provides replacement registered nurses to employers whose employees are on strike.[1]

Professional presents three issues for our consideration. Slightly rephrased, they are as follows:

I. Did the court below err in permitting DHC to intervene as a party defendant when no claim was asserted against it, and assuming intervention in some form were appropriate, did the lower court err in treating DHC's answer as though it constituted an amendment to plaintiff's complaint, adding a non-existent and meritless tort claim against DHC, and then holding the non-asserted tort claim both preempted and dismissed for failure to state the elements of the tort?

II. Did the lower court improperly consider and rely on matters outside the pleadings in ruling on a motion to dismiss, and did the complaint in any event plead the elements of the claim that Favorite Nurses tortiously interfered with economic and business relations between PSNA and DHC?

III. Is the tortious interference claim against FN preempted by either *Garmon* or *Machinists* NLRA preemption where FN is not in an employer-employee or employer-union relationship with either PSNA or DHC, and where the narrow regulatory range of the tort and the strikebreaker act as to FN place the claim squarely within preemption exceptions for matters deeply rooted in local feeling and responsibility and for matters of only peripheral concern to the federal labor law system?

---

1. Professional named five defendants in its complaint: Cross Country Healthcare, Favorite Nurses, Inc., Healthcare Options, Inc., Travacorps, and U.S. Nursing Corporation. Favorite, the only named defendant to respond to the complaint, waived service of process; Professional did not serve process upon the other named defendants.

# I.

## Facts [2]

■ Dimensions owns and operates four health-care facilities in Prince George's County: Prince George's Hospital Center, Laurel Regional Medical Center, Gladys Spellman Nursing Center, and the Bowie Health Center. Professional, an unincorporated labor union, represents approximately seven hundred registered nurses who work at Dimensions's Prince George's County facilities. For eight years, beginning in 1986, Dimensions and Professional successfully negotiated collective bargaining agreements relating to the wages, hours, and other terms and conditions affecting Professional's union members employed by Dimensions. Beginning in the summer of 1994, and continuing into early winter of that same year, the parties engaged in collective bargaining negotiations. The efforts were to no avail, and Professional served Dimensions with a ten day notice [3] that its members would go on strike beginning on December 14, 1994.[4] Professional apparently called off the strike, for on December 24, 1994, the parties attended a mediation session conducted by the Federal Mediation and Conciliation Service. Over the next several months, ending in March of 1995, the parties pursued a course of negotiation. On April 4, 1995, Professional served Dimensions with its second ten day strike notice. Two days before the

---

**2.** Although the circuit court stated that appellants' motion to dismiss would not be converted into a motion for summary judgment, the circuit court, nevertheless, considered documents other than the complaint in rendering its opinion. *See infra* at page 12. In ruling on a motion to dismiss, a court is limited to the allegations contained in the complaint. Accordingly, our recitation of facts is based on those allegations. *See* Md. Rule 2–322(c) (1996).

**3.** Normally, a labor union has to give at least ten days notice to a health care institution before instituting a strike. *See* 29 U.S.C. § 158(g) ("A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing....").

**4.** The parties agreed to extend the term of, and operate under the conditions of, the collective bargaining agreement of the previous term.

strike date, Professional filed suit in the Circuit Court for Prince George's County against Favorite and other firms providing similar services.

## II.

### Proceedings

On April 13, 1995, one day after Professional filed its complaint, Dimensions filed, pursuant to Maryland Rule 2–214, a motion for permissive intervention supported by an affidavit of Steven Smith, its Senior Vice President and General Counsel.[5] On the same day, Dimensions and Favorite filed a motion to dismiss Professional's complaint. Due to the time sensitive nature of the matter, the circuit court scheduled a hearing for April 14, 1995. After hearing argument on the pending motions, the circuit court ruled, in part, that Professional would have until May 1, 1995 to respond to the motion to intervene filed by Dimensions and the motion to dismiss filed by Dimensions and Favorite.

Instead of entertaining arguments on the motions on May 5, 1995, as it had previously announced, the circuit court, with consent of the parties' counsel, took the case out of the assignment. In a memorandum opinion and scheduling order dated May 8, 1995, the circuit court set forth the timetable for motions and other matters. For our purposes, the circuit court stated:

When analyzing and ruling on the pending Motions to Dismiss, the Court will confine itself to the pleadings and the supporting documents filed as of this date. For the reason that discovery has not been obtained and will be deferred until after a ruling on the Motion to Dismiss, the Court will not convert the Motion to Dismiss to a Motion for Summary Judgment at the hearing on May 30, 1995 as the rule normally permits this Court to do in its discretion. Furthermore, until discovery has been completed, this

---

**5.** On May 5, 1995, Dimensions filed an amended motion to intervene supported by a supplemental affidavit of Steven Smith.

Court will not rule on any further dispositive motions which may be filed in the future.

At the conclusion of the May 30th hearing, the circuit court granted Dimensions' motion for permissive intervention. At that time, the circuit court took under advisement the motion to dismiss filed by Dimensions and Favorite. Approximately one month later, on July 25, 1995, the circuit court issued its opinion and order, in which it dismissed Professional's complaint under alternative but overlapping theories: federal preemption and failure to state a claim. On August 2, 1995, Professional timely noted an appeal to this Court.

## III.

### Discussion

Section 4–403 of the Labor and Employment Article is the crux of this dispute.

**Strikebreakers.**

(a) *Recruitment restricted.*—A person who is not directly interested in a strike may not provide, obtain, recruit, or refer, for employment in place of a striker, an individual who customarily and repeatedly offers to be employed in place of strikers.

(b) *Employment as strikebreaker restricted.*—An individual who customarily and repeatedly offers to be employed in place of strikers may not take or offer to take the position of a striker.

(c) *Penalty.*—A person who violates any provision of this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 3 years or both.

The General Assembly enacted the predecessor to § 4–403, Md.Code (1957, 1964 Repl.Vol.), Art. 100 § 51A, in 1961. Since that time, neither our Court nor the Court of Appeals has been called upon to examine the section. We now proceed to do so.

## A.

Professional contends that the circuit court erred when it allowed Dimensions to intervene in the action between Professional and Favorite and that the circuit court's consideration of Dimensions' pleadings resulted in the circuit court addressing claims not made by Professional.

The court in its opinion below constructs the straw man of a hypothetical tort claim against DHC for interference with its own relationship with PSNA, and then, unsurprisingly, concludes such a theory is unworkable. Of course it is; it was never pled by plaintiff here, and the blatant inappropriateness of the argument demonstrates the inappropriateness of permitting intervention. Even worse, the court's entire consideration of the preemption issues was framed as though[ ] the tortious interference claim were asserted against DHC, an employer in an NLRA-established relationship with PSNA. This, of course, is precisely the opposite of the theory of the Complaint.

■ Maryland Rule 2–214(b) governs permissive intervention; subsection (c) sets forth the applicable procedure.

**(b) Permissive.—**

(1) *Generally.*—Upon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action.

. . .

(3) *Considerations.*—In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

**(c) Procedure.**—A person desiring to intervene shall file and serve a motion to intervene. The motion shall state the grounds therefor and shall be accompanied by a copy of the proposed pleading setting forth the claim or defense for which intervention is sought. An order granting intervention shall designate the intervenor as a plaintiff or a defen-

dant. Thereupon, the intervenor shall promptly file the pleading and serve it upon the parties.

Our review of the circuit court's ruling on a motion for permissive intervention is limited to determining whether the court abused its discretion. *Maryland Radiological Soc'y, Inc. v. Health Servs. Cost Review Comm'n*, 285 Md. 383, 392, 402 A.2d 907 (1979).[6]

Maryland Rule 2–214 requires that the prospective intervenor timely file an application to intervene. *Coalition for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 367, 635 A.2d 412 (1994). In the case at bar, timeliness is not an issue because Dimensions filed its first motion to intervene before Professional served process upon the defendants named in the complaint. The other requirement under Rule 2–214 is that the intervenor's claim or defense present "a question of law or fact in common with the action." Dimensions and Favorite jointly asserted federal preemption as a defense to Professional's reliance on Maryland's strikebreaker statute. *See supra* § 4–403. Without doubt, a common question of law or fact was presented. Moreover, Dimensions had an interest in the cause in that an adverse ruling against the

---

6. *Maryland Radiological Soc'y, Inc.* applied former Maryland Rule 208(b)-(c) (1979), which is similar to current Rule 2–214(b)–(c). The former Rule provided as follows.

 b. *Permissive.*
 1. Person.
Upon timely application a person may be permitted to intervene in an action when his claim or defense has a question of law or fact in common with the action.

 . . .

 c. *Procedure.*
 1. Motion.
An application to intervene shall be made by motion.
 2. Leave of the Court.
Leave to intervene shall be granted only by court order, which shall designate the intervenor as a party plaintiff or defendant.
 3. Service.
A copy of the motion and any order thereon, and of any pleading filed by the intervenor shall be served in the same manner as an amended pleading pursuant to Rule 320 d 4. . . .

named defendants would have directly affected Dimensions's ability to respond to Professional's threatened strike.

■■■■ Once the circuit court granted Dimensions' motion to intervene, Dimensions became a party to the action and was entitled to assert its rights as such.

[A]n intervening defendant becomes a party when the order granting intervention is signed, not when the intervening defendant files an answer.

The language of Maryland rule 2–214(c) itself implies that the intervenor becomes a party when the order is granted because the Rule requires the order granting intervention to designate the intervenor as a plaintiff or defendant, terms used for parties. In addition ... Rule 2–214(c) requires that an intervening defendant file, along with its motion to intervene, a proposed pleading which shall promptly be filed and served, upon the granting of intervention. Because only a party may assert rights in the case, this requirement supports our interpretation that an intervenor immediately becomes a party.

*MAIF v. Soffas,* 89 Md.App. 663, 673, 599 A.2d 837 (1991). "After intervention, an intervenor has the same rights and powers to effectuate its rights as an original party." *Id.* at 674, 599 A.2d 837; *Montgomery County v. Supervisor of Assessments,* 275 Md. 58, 62–63, 337 A.2d 679 (1975); *Montgomery County v. Meany,* 34 Md.App. 647, 650, 368 A.2d 1107, *aff'd,* 281 Md. 206, 377 A.2d 1184 (1977) *(per curiam )* ("As an intervenor has all the rights as a party and a party has the right to appeal, Montgomery County [the intervenor] has the right to appeal.").

A remaining hurdle is whether Dimensions may litigate issues that existed in the original dispute and inject new issues. In *Conroy v. Southern Maryland Agric. Ass'n,* 165 Md. 494, 169 A. 802 (1934), the Court of Appeals touched upon that issue. The question before the Court was whether the circuit court erred when it dismissed the petition of an individual whom the circuit court had allowed to intervene as a plaintiff in the underlying action.

The effect of the order was not, necessarily, to dismiss Conroy [the intervenor] as a party to the suit, although it reserved to him the privilege of moving for a rescission of the order making him a party, if he deemed such action appropriate to his seeking relief in an independent action. *Nor did it prevent him from litigating in this proceeding any issue made by the pleadings as he found them when he was made a party.*

If his petition introduced no issues in the case other than those already made when he became a party, he was not injured by its dismissal, for in that case it was no more than a restatement of existing issues. If, on the other hand, his petition did raise additional issues different from those made by the pleadings as he found them when he came into the case, then in dismissing it the court acted within the proper limits of a sound discretion.

There may be cases in which an interven[o]r may be entitled as a matter of right to assert in a proceeding in which he has been allowed to intervene claims adverse to those of any or all of the original parties, even though the exercise of the right involves the introduction of additional issues, where that is necessary to protect his interests which will be concluded by the ultimate decision, and where such issues are consistent with and incidental to the objects and purposes of the suit *ibidem,* but this is not such a case.

*Id.* at 502, 169 A. 802 (emphasis added).

■ Dimensions and Favorite jointly filed all motions to dismiss and raised federal preemption and failure to state a cause of action as their primary defenses. The circuit court analyzed Professional's complaint in relation to Favorite, the original defendant, and Dimensions, the intervenor. Professional argues that the circuit court erred in examining Professional's complaint as if it were drafted to include Dimensions because Professional conceded that it could not state a cause of action against Dimensions. The circuit court acknowledged the reasoning and stated, "Our research reveals no Maryland case law creating a tort in which a defendant interferes in a

business relationship between itself and a third party." Maryland does not recognize that variation of the tort. *See Travelers Indem. Co. v. Merling,* 326 Md. 329, 343, 605 A.2d 83, *cert. denied,* 506 U.S. 975, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992) ("For the tort [of wrongful interference with contractual or economic relations] to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered.").

██ The circuit court properly considered arguments made by both Dimensions and Favorite, however, with respect to the issues of federal preemption and whether a cause of action was stated against Favorite. Having been permitted to intervene based on common questions of law or fact, Dimensions had the right to take a position on existing issues and to inject new issues consistent with the objects and purposes of the original suit.[7] We conclude that the circuit court neither abused its discretion in granting the motion to intervene nor in considering arguments made by Dimensions in its motion to dismiss.

### B.

██ The circuit court, Professional argues, improperly considered and relied on matters outside of the complaint in ruling on Favorite and Dimensions' motion to dismiss. We agree.

The circuit court informed the parties that it would not convert the motion to dismiss into a motion for summary judgment at the May 30, 1995 hearing (*see* Maryland Rule 2–322(c)), but the circuit court's opinion makes reference to matters outside the complaint. The circuit court referred to the proposed answer of Dimensions and the supplemental

---

7. In Steven Smith's supplemental affidavit, he stated that Dimensions would indemnify Favorite for "any and all damages imposed." This affidavit was properly considered for purposes of the motion to intervene. We are not considering it for purposes of the motion to dismiss. *See* discussion in III B, *infra.*

affidavit provided by Dimensions' Senior Vice President and General Counsel, Steven Smith.

In deciding a motion to dismiss for failure to state a claim, pursuant to Maryland Rule 2–322, a court

"must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." Moreover, we consider the "well-pleaded allegations" in the light most favorable to the non-moving party. Our task is to determine whether the facts alleged in appellant's complaint are legally sufficient to state a cause of action. We limit our review, however, to specific allegations of fact and the inferences deducible from them, and not "merely conclusory charges."

*McIntyre v. Guild, Inc.*, 105 Md.App. 332, 342–43, 659 A.2d 398 (1995) (citations omitted). The parties agree that a ruling on a motion to dismiss is before us. Accordingly, our focus centers upon the complaint.

Maryland common law recognizes two types of actions for tortious interference with business relationships. *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 297, 639 A.2d 112 (1994). In *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663 (1984), Judge Eldridge, writing for the Court of Appeals, traced the history of, and recited the elements of, the tort. He stated:

[T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with

economic relations exists where no contract or a contract terminable at will is involved.

*Id.* at 69–70, 485 A.2d 663 (footnote omitted).[8] In paragraphs seventeen and nineteen of its complaint, Professional sets forth the actions it protests.

17. At all times mentioned herein, including, but not limited to the two ten (10) day strike notice periods (from December 14 to December 24, 1994, and from April 4 to April 14, 1995), Defendants Cross Country, Favorite Nurses, Healthcare Options, Travacorps, and U.S. Nursing *have intentionally and without legal justification interfered with the continuing economic/business relationship between Plaintiff PSNA and DHC by providing, obtaining, recruiting, or referring for employment in the place of the striking 700 RN [registered nurses] PSNA members, individuals (i.e., RN strikebreakers) who customarily and repeatedly offer to be employed in the place of striking RN's.*

. . .

19. Defendants Cross Country's, Favorite Nurses', Healthcare Options', Travacorps', and U.S. Nursing's *conduct as described in Paragraph 17 of this Complaint, has been malicious, wrongful and in violation of Maryland Code Ann., Labor and Employment, Sections 4–403(a), as amended,* which prohibits persons not directly interested in the strike from providing, obtaining, recruiting, or referring individuals who customarily and repeatedly offer to be employed in place of strikers, for employment in place of strikers.

---

**8.** Restatement (Second) of Torts, § 766B, describes the variant of the tort under discussion.

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

(Emphasis added). The language of Professional's complaint contains a charge of maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The conduct at issue, alleged to be "malicious, wrongful and in violation of" § 4–403, is Favorite's "providing, obtaining, recruiting, or referring for employment in the place of the striking 700 RN [registered nurses] PSNA members, individuals (i.e., RN strikebreakers) who customarily and repeatedly offer to be employed in the place of striking RN's." Professional suggests that this "case presents the classic ends-means analysis for tortious interference with economic relations. . . . Either an unlawful purpose or improper means will render economic interference tortious, particularly when the interfering actor is not a direct competitor of the party whose business relationship is disrupted." Professional's use of the disjunctive is fallacious. Liability will not attach unless there is, among other things, an unlawful purpose *coupled with* an unlawful or improper act. *Macklin,* 334 Md. at 301, 639 A.2d 112 ("To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct."); *see* RESTATEMENT (SECOND) OF TORTS § 768(1)(b) (1977).

In *Willner v. Silverman,* 109 Md. 341, 71 A. 962 (1909), the Court of Appeals considered the appeal of an employee whose claims included that his former employers, who had discharged him, "maliciously conspired or contrived to injure him by blacklisting him and writing a letter, containing false statements, to the members of an association . . . and requesting such Association members to refuse employment to" him. *Id.* at 353, 71 A. 962. Judge Henry, writing for the Court of Appeals, quoted *Walker v. Cronin,* 107 Mass. 555 (1871), for that Court's recitation of the elements of tortious interference with economic relations.

(1) intentional and wilful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, (which constitutes malice), and (4) actual damage and loss resulting.

*Walker,* 107 Mass. at 562. One year earlier than *Willner,* in *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 69 A. 405 (1908), Chief Judge Boyd discussed the distinctions between motives and acts. Among the questions before the Court was whether appellant had caused a third party to break its contract to supply ice to appellee. *Id.* at 558, 69 A. 405. After surveying the common law, Chief Judge Boyd made the following observations:

> It is not altogether easy to lay down general rules as established by the cases but some principles are quite well settled by them. It may be safely said that if wrongful or unlawful means are employed to induce the breach of a contract, and injury ensues, the party so causing the breach is liable in an action of tort. While lawful competition must be sustained and encouraged by the law, it is not lawful, in order to procure the benefit for himself, for one to wrongfully force a party to an existing contract to break it, and a threat to do an act which would seriously cripple, if not ruin, such party, unless he does break it, is equivalent to force as that term is used in this connection. We say 'wrongfully' force, because the procurer would not be liable if he had the right to compel the party to break his contract. . . .
>
> Again the mere fact that a party acts from a bad motive or maliciously does not necessarily make him liable. If he has the right to act, his motive in acting cannot of itself make his act wrongful, but if he had no right to procure a breach of contract and resorts to unlawful means in doing so, he is liable to the injured party. We say 'unlawful means' because a party may be the means of causing a contract to be broken, and still not be liable. To illustrate, A may advertise his goods for sale at such a low rate as to result in a breach of contract by B, who was under contract with C, to buy at a higher price, but that would not make A liable to C. . . .

*Id.* at 566–67, 69 A. 405.

Turning back to *Natural Design, Inc.,* a case involving matters pertaining to restraint of trade, the Court of Appeals

discussed several other issues germane to the present discussion. The Court quoted from *Goldman v. Harford Rd. Bldg. Ass'n*, 150 Md. 677, 133 A. 843 (1926), for that Court's discussion of competition.

> Iron sharpeneth iron is ancient wisdom, and the law is in accord in favoring free competition, since ordinarily it is essential to the general welfare of society, notwithstanding competition is not altruistic but is fundamentally the play of interest against interest, and so involves the interference of the successful competitor with the interest of his unsuccessful competitor in the matter of their common rivalry. Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong.

*Id.* at 684, 133 A. 843.

In *Natural Design, Inc.*, the Court of Appeals agreed with appellants, shopping center tenants, that they had presented sufficient evidence to preclude the entry of summary judgment on their claim for intentional interference with business relations. Specifically, the Court accepted appellants' argument that, if appellees' actions were proven to be part of a price-fixing scheme in violation of Maryland's Antitrust Act, *see* §§ 11–201 to 11–213 of the Commercial Law Article, those actions "would also constitute the Maryland common law tort of malicious interference with the plaintiffs' [appellants'] business. Under these circumstances, the acts would be unlawful and thus improper." *Natural Design, Inc.*, 302 Md. at 74, 485 A.2d 663.[9]

---

9. The Court of Appeals pointed out that, prior to the General Assembly's enactment of the Maryland Antitrust Act, the Court "took the position that acts in furtherance of a price-fixing conspiracy or combination were unlawful and that, if damage resulted from such acts, those injured had a cause of action for interference with their business." *Natural Design, Inc.*, 302 Md. at 74, 485 A.2d 663; *see Klingel's Pharmacy v. Sharp & Dohme*, 104 Md. 218, 234–38, 235, 64 A. 1029 (1906).

Professional furnishes no authority, other than § 4–403, to indicate that Favorite's actions in "providing, obtaining, recruiting, or referring" strikebreakers were unlawful or improper. Additionally, there is no allegation that Favorite engaged in an activity otherwise lawful in a manner that made it unlawful, *e.g.*, threatening or causing violence. *See Macklin*, 334 Md. at 300, 639 A.2d 112.

Professional's complaint can be rescued only if § 4–403 is applicable and valid.[10] Subsection (a) restricts those not directly "interested" in a strike from "provid[ing], obtain[ing], recruit[ing], or refer[ring], for employment in place of a striker, an individual who customarily and repeatedly offers to be employed in place of strikers." Subsection (c) makes the violation of subsection (a) or (b) a misdemeanor offense, and fixes the penalties at a "fine not exceeding $1,000 or imprisonment not exceeding 3 years or both."

■ ▇▇▇▇ Discernment and effectuation of the General Assembly's intent are the primary goals for which we strive when engaging in statutory construction. *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995). We begin our analysis with the plain language of the statute and give those words their natural and ordinary meanings. *Board of Trustees v. Hughes*, 340 Md. 1, 7, 664 A.2d 1250 (1995). In our case, although Favorite is interested in the strike,[11] it is not a

---

**10.** In 1993, the General Assembly decided, subject to the evaluation and reestablishment provisions of the Maryland Program Evaluation Act (State Government Article § 8–401 et seq.), that certain provisions of Title 4 of the Labor and Employment Article, including § 4–403 "shall *terminate and be of no effect after July 1, 2004."* § 4–405 of the Labor and Employment Article (1991 Repl. Vol, 1995 Supp.).

**11.** Under Title 4, Bargaining Representatives; Labor Disputes, Subtitle 3, Injunctions, § 4–301, Definitions, the General Assembly set forth the definition of a *"Person participating or interested in a labor dispute."*

"Person participating or interested in a labor dispute" means a person against whom relief is sought if the person:
 (1) is engaged in the industry, craft, trade, or occupation in which the dispute occurs; or

person [12] "directly interested" in the strike, as those words are used in subsection (a) of § 4–403; those words refer to management and its agents. Therefore, a civil cause of action (or a criminal action), grounded in § 4–403(a), could be brought against Favorite, but not against Dimensions. Following the rationale of *Natural Design, Inc.*, we conclude that, because Favorite's alleged conduct contravened the dictates of § 4–403 subsection (a), the conduct was unlawful and, accordingly, satisfied the unlawful or improper conduct element of the tort claim before us.

### C.

Having made that determination, we are compelled to address the question of federal preemption. *Employment Sec. Admin. v. Baltimore Lutheran High School Assoc., Inc.*, 291 Md. 750, 754 n. 2, 436 A.2d 481 (1981) ("Ordinarily, courts do not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which to dispose of the case, and do not decide questions of a constitutional nature unless absolutely necessary to a decision of the case."); *Insurance Comm'r v. Equitable Life Assurance Soc'y*, 339 Md. 596, 614, 664 A.2d 862 (1995).

■■■ Professional offers four reasons why we should uphold § 4–403 against Dimensions's and Favorite's federal preemption attack. First, Professional rightly points out that § 4–403 "is entitled to the benefit of a strong presumption of constitutionality." *See Verzi v. Baltimore County*, 333 Md. 411, 419, 635 A.2d 967 (1994); *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93 (1994) ("If a statute is susceptible of two

---

(2) is an agent, member, or officer of an association of employees or employers engaged in the industry, craft, trade, or occupation in which the dispute occurs.

**12.** Section 1–101(d) of the Labor and Employment Article defines "person" as "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity."

reasonable interpretations, one of which would involve a decision as to its constitutionality, the preferred construction is that which avoids the determination of constitutionality."). Next, Professional declares that the "typical body of preemption case law is inapplicable" to the instant dispute because reliance on the Maryland statute is not essential to state a cause of action and the statute is directed to a third party contractor and not the employer in any event. Professional argues that, even if an employer cannot be prohibited from contracting with a third party for replacement workers, it does not follow that third parties have a right to supply replacement workers. Third, Professional suggests that the restrictions placed upon third parties by § 4–403 are "extremely limited," and thus are, on the one hand, "only of 'peripheral concern' to federal labor policy," while, on the other hand, squarely encompass "conduct so deeply rooted in local feelings and responsibilities that local regulation is permitted. . . ." Last, and most important, Professional asserts, the circuit court wrongly assumed that Dimensions had a right, whether under federal or state law, not merely to hire replacement workers itself, but had a right to do so through an independent contractor such as Favorite, and had a right to hire professional strikebreakers.

Federal preemption of state law is rooted in the principles enunciated by the Founding Fathers in the Supremacy Clause of the United States Constitution.[13] "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). The United States Congress has enacted numerous regulations pertaining to labor relations, the subject matter of the instant dispute. *See* 29 U.S.C. §§ 151—167 (National Labor Relations Act or "NLRA"). Because the NLRA does not contain a preemption provision, the Supreme Court has held that a local regulation will be upheld

---

13. *See Hicks v. State,* 109 Md.App. 113, 674 A.2d 55, 59–60 (1996), for a discussion of federal preemption generally in a non labor law context.

unless it conflicts with the NLRA or would frustrate the federal scheme, or unless the totality of the circumstances indicate that Congress sought to occupy the entire field to the exclusion of the states. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747–48, 105 S.Ct. 2380, 2393–94, 85 L.Ed.2d 728 (1985). In response to the conflicts between federal and state labor laws, two distinct preemption doctrines have developed.

The first doctrine sprang from the Supreme Court's opinion in *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).[14] That case, more commonly known as *Garmon,* involved the question of whether a "California court had jurisdiction to award damages arising out of peaceful union activity which it could not enjoin," to wit, peaceful picketing by labor unions that had not been selected by a majority of the employees of the picketed employer as their bargaining agents. *Id.* at 237–39, 79 S.Ct. at 775–76. Justice Frankfurter, writing for the Court, held that the National Labor Relations Board ("NLRB") has exclusive jurisdiction over activities arguably subject to §§ 157 and 158 of the NLRA. *Id.* at 245–47, 79 S.Ct. at 779–81. He explained:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 [29 U.S.C. § 157] of the National Labor Relations Act, or constitute an unfair labor practice under § 8 [29 U.S.C. § 158], due regard for the federal enactment requires that state jurisdiction must yield. To leave the

---

**14.** The Court of Appeals has had occasion to discuss labor law preemption in two cases. In *Vane v. Nocella,* 303 Md. 362, 494 A.2d 181 (1985), the Court held that the action before it was preempted under *Garmon.* A supervisor employed by management sued the union, alleging that the union had coerced his employer to discharge him. The Court held that the union conduct was arguably prohibited by § 8 [29 U.S.C. § 158], which forbids coercing an employer in the choice of its collective bargaining representative.

The second Court of Appeals decision, *Memco v. Maryland Employment Sec. Admin.,* 280 Md. 536, 375 A.2d 1086 (1977), is discussed at page 29, *infra.*

States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these regulations. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act [NLRA] that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board.

*Id.* at 244–45, 79 S.Ct. at 779 (footnote omitted).

The second doctrine relates to the "free play of economic forces" and was announced by Justice Brennan for the Court in *Lodge 76 v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (referred to as "*Machinists* "). The issue in *Machinists* was whether federal labor policy preempted state labor policy in the context of management turning to state law for leverage against labor when management's economic weapons failed to overwhelm labor's strength. *Id.* at 134, 96 S.Ct. at 2550. Management sought to implement an increase in labor's weekly hours prior to the effective date of the parties' collective bargaining agreement, but labor resisted the change by ordering its members not to work overtime. *Id.* at 135, 96 S.Ct. at 2551. Management sought redress from the NLRB, but the Regional Director dismissed management's claim as not charging actions that were violative of § 29 U.S.C. 158(b)(3). *Id.* at 136, 96 S.Ct. at 2551. Not relying solely on the NLRB, management

also filed a complaint before Wisconsin's Employment Relations Commission. *Id.* Wisconsin's Commission determined that the NLRA did not apply, and accordingly ordered labor to stop "encouraging" employees to refuse overtime assignments. *Id.* at 136–37, 96 S.Ct. at 2551–52. The Wisconsin Circuit Court affirmed the Commission's decision, and that decision, in turn, was affirmed by the Wisconsin Supreme Court. *Id.* 137, 96 S.Ct. at 2552.

The United States Supreme Court reversed the State Court judgment because labor's "refusal to work overtime [wa]s peaceful conduct constituting activity which must be free of regulation by the States if the congressional intent in enacting the comprehensive federal law of labor relations is not to be frustrate[d]. . . ." *Id.* at 156, 96 S.Ct. at 2561. In discussing "economic self-help means," Justice Brennan recognized that management is entitled to self-help.

> Although many of our past decisions concerning conduct left by Congress to the free play of economic forces address the question in the context of union and employee activities, self-help is of course also the prerogative of the employer because he, too, may properly employ economic weapons Congress meant to be unregulable.

*Id.* at 148, 96 S.Ct. at 2557. *See American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 317, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965) (Use of economic weapons is the right of management as well as labor); *Machinists,* 427 U.S. at 148, 96 S.Ct. at 2557. Furthermore, Justice Brennan quoted from *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 380, 89 S.Ct. 1109, 1116, 22 L.Ed.2d 344 (1969), a case analyzing the Railway Labor Act, 45 U.S.C. §§ 151—164, for the discussion pertaining to self-help found therein.

> Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'

*Machinists,* 427 U.S. at 148–49, 96 S.Ct. at 2557. Justice Brennan then went on to discuss Wisconsin's entrance into the arena.

There is simply no question that the Act's [NLRA] processes would be frustrated in the instant case were the State's ruling permitted to stand. The employer in this case invoked the Wisconsin law because it was unable to overcome the Union tactic with its own economic self-help means. .Although it did employ economic weapons putting pressure on the Union when it terminated the previous agreement ... it apparently lacked sufficient economic strength to secure its bargaining demands under 'the balance of power between labor and management expressed in our national labor policy,' *Teamsters Union v. Morton,* 377 U.S. at 260, 84 S.Ct. at 1258 .... but the economic weakness of the affected party cannot justify state aid contrary to federal law for, as we have developed, 'the use of economic pressure by the parties to a labor dispute is not a grudging exception [under] ... the [federal] Act; it is part and parcel of the process of collective bargaining.' *Insurance Agents,* 361 U.S. at 495, 80 S.Ct. at 430.... The state action in this case is not filling 'a regulatory void which Congress plainly assumed would not exist,' *Hanna Mining Co. v. Marine Engineers,* 382 U.S. at 196, 86 S.Ct. at 335 [Brennan, J., concurring].... Rather, it is clear beyond question that Wisconsin '[entered] into the substantive aspects of the bargaining process to an extent Congress has not countenanced.' *NLRB v. Insurance Agents* [, 361 U.S. at 498, 80 S.Ct. at 432]....

*Id.* at 149–50, 96 S.Ct. at 2557–58 (footnotes omitted).

The last Supreme Court case to discuss the two doctrines is *Building and Constr. Trades Council v. Associated Builders and Contractors,* 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). Although the issue in that case is not germane to our discussion, Justice Blackmun's summary of the two doctrines, for a unanimous Court, is very relevant.

When we say that the NLRA preempts state law, we mean that the NLRA prevents a State from regulating

within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*.

[W]e have held consistently that the NLRA was intended to supplant state labor *regulation*, not all legitimate state activity that affects labor.

*Id.* at 227, 113 S.Ct. at 1196.

The Supreme Court has recognized two exceptions to the *Garmon* and *Machinists* doctrines.

However, due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.

*Garmon*, 359 U.S. at 243–44, 79 S.Ct. at 778–79 (citation omitted).

 The parties before us concede that the issue presented necessitates a *Machinists'* type analysis because the conduct in question does not fall within the arguably protected or arguably prohibited prongs of the NRLA. Our focus, then, is upon the effect of § 4–403 on the economic weapons available to the parties and whether § 4–403 impermissibly affects the balance of power. We have acknowledged that § 4–403 does not apply, by its direct terms, to management. Nevertheless, the effect of the statute on third parties willing to supply management with professional strikebreakers, who, when shorn of their pejorative title are replacement workers, hampers management's ability to respond through economic means to labor's threatened strikes. In other words, by proscribing the types of individuals who may replace striking workers, and by limiting the "persons" available for employ-

ment, the General Assembly indirectly interfered with self help economic activities of management.

As required by law, Professional gave to Dimensions a ten day strike notice. Within that time frame, desirous of resisting Professional's strike weapon, Dimensions exercised its right to hire replacement workers. *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). The right does not have to be extinguished in order for the restriction to be impermissible. The manner in which Dimensions exercised that right, and the types of workers it could choose were restricted by § 4–403. Under that section, Dimensions could not have chosen from the entire labor pool of qualified workers—it could have only chosen workers who do not "customarily and repeatedly" offer to be employed in place of strikers. The effect of the statute is to regulate labor-management relations, an effect that is impermissible, as distinguished from an incidental effect on labor and management that flows from regulation of an area of legitimate State interest. Accordingly, we must reject Professional's arguments that, because Dimensions is free to hire replacement workers without utilizing a third party and without hiring professional strikebreakers, it is not impermissibly restricted by § 4–403.

As noted, matters of peripheral concern of the NLRA or conduct touching interests so deeply rooted in local feeling and responsibility, in the absence of congressional pronouncement, may be regulated by the states. *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 778–79; *see MEMCO,* 280 Md. at 549–57, 375 A.2d 1086 (applying *Machinists* preemption and holding that statute (now LE § 8–1004) permitting payment of unemployment benefits to workers on lockout was not preempted because it had negligible impact on federal labor policy). The previous discussion makes pellucid that § 4–403 impermissibly interferes with the economic power of management and labor. On the latter point, Professional's complaint contains no allegation of an activity that forms the basis for an ordinary tort action. For example, there is no allegation of nuisance, tres-

pass, violence, or threatened violence; matters within the State's authority to regulate. *See Machinists,* 427 U.S. at 137, 137 n. 2, 96 S.Ct. at 2552, 2552 n. 2, ("Policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States.").[15] In fact, the only allegation of damage is in disrupting the bargaining relationship between the parties and Professional's strike plans. Therefore, those two avenues of redeeming § 4–403 are unavailable to Professional.

There is no U.S. Supreme Court holding on point with respect to the preemption issue before us, but other courts have reached the result that we have reached in analogous situations. *See Greater Boston Chamber of Commerce v. Boston,* 778 F.Supp. 95 (D.Mass.1991); *Charlesgate Nursing Center v. State,* 723 F.Supp. 859 (D.R.I.1989); *Chamber of Commerce v. State,* 89 N.J. 131, 445 A.2d 353 (1982).

For the reasons stated above, we hold that § 4–403 impermissibly affects the economic tools available to management and labor in collective bargaining and is, therefore, preempted under *Machinists.* Consequently, the complaint fails to state a cause of action.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

**15.** Professional's reliance on what it terms the federal anti-strikebreaker act, 18 U.S.C. § 1231, for the proposition that Congress intended to exclude states from this area of regulation is misplaced. That section punishes persons engaged in the transportation in interstate or foreign commerce of "any person who is employed or is to be employed for the purpose of obstructing or interfering by force or threats" with peaceful picketing or the exercise of collective bargaining; the persons employed are also subject to punishment. Likewise, the case cited by Professional, *Warren v. State,* 313 So.2d 6 (La.Ct.App.1975), is unpersuasive for it upholds a state statute almost identical to 18 U.S.C. § 1231.